No. 94,619

STATE OF KANSAS, *Appellee*, v. THOMAS E. MURRAY, *Appellant*.

(174 P.3d 407)

Opinion filed January 18, 2008.

*Sarah Ellen Johnson*, capital appellate defender, argued the cause and was on the brief for appellant.

*Angela M. Wilson*, assistant district attorney, argued the cause, and *Charles E. Branson*, district attorney, and *Paul J. Morrison*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Thomas Murray appeals from his conviction of first-degree murder for killing his former wife. He contends that his conviction must be reversed based on the following claims of error: (1) Prosecutorial misconduct during the State's closing argument; (2) the admission of testimony regarding the defendant's post-*Miranda* silence; (3) the admission of hearsay statements of the victim concerning her relationship with the defendant; (4) cumulative error; and (5) insufficiency of the evidence to support his conviction. We conclude that no reversible error occurred and affirm.

*Facts*

On November 14, 2003, the Douglas County Sheriff's Department received a call from Larry Lima, who lived in California,

requesting that the police conduct a welfare check on his fiancee, Carmin Ross. Carmin lived at 1860 E. 1150 Road in rural Douglas County. The home is situated about .6 miles from County Road 438 and about 500 feet from the nearest residence.

The officers arrived at Carmin's residence shortly after 1 p.m. and knocked on the front door. One of the officers looked through a window and saw what appeared to be blood and someone's knee. The officers split up and met again at the back of the home; neither officer present observed any broken windows or other signs of forced entry into the home.

After entering the home through the back door, the officers found Carmin lying on the floor in her living room. The room was in disarray, with a potted plant on its side and the coffee table partially flipped over on the couch. Blood spots were found throughout the area. There was no evidence of a sexual assault and no evidence that anything had been removed from the home.

An autopsy revealed that Carmin had suffered 11 lacerations due to blunt force injury followed by 13 stabs in the neck with a knife, as well as several defensive wounds on her arms. Neither the knife nor any other weapon was found on the premises, although a knife was missing from Carmin's knife block in the kitchen. The detectives hypothesized that Carmin's attacker had first beaten her, and, unsure whether the beatings would kill her, the attacker retrieved a knife from Carmin's kitchen and stabbed her.

Aside from the mess in the living room, Carmin's house was clean and well kept. In addition, Carmin's car was still in the driveway; no windows were broken, and there was no indication that anything had been stolen.

An exhaustive investigation ensued. Officers searched the roadway and garbage from rest areas near Carmin's home and interviewed all those who knew Carmin to determine when she had last been seen alive.

The Riley County Police Department contacted the defendant at about 7:30 p.m. on November 14, 2003. The defendant and Carmin had been married until Carmin met Lima at a conference in Wichita in 2002; they divorced in the spring of 2003 and were currently in a custody struggle over their 4-year-old daughter,

Ciara. When the police arrived at the defendant's home, the defendant walked into an adjacent room, picked up Ciara, and answered the door with his daughter in his arms. The defendant appeared distraught when the police informed him that Carmin had died. However, he never asked the officers how Carmin had died or whether her death had involved foul play. The defendant then drove himself to the police department for a requested interview with police.

The defendant's interview at the police department lasted approximately 9½ hours, with the majority of the interview being audio- and video-recorded. The detectives noticed that during the first 2 hours of the interview, the defendant kept his right hand in his lap or under his leg. The detectives later noticed that the defendant had a cut on his little finger on his right hand and bruises along the outside of both of his wrists and on his hands and arms. The defendant explained that he cut his finger when cutting a pineapple for Ciara. Although he initially could not remember where the bruises came from, he later told the investigators he was bruised when he was playing with Ciara and bouncing her on his knees.

By 9 p.m., the defendant still had not asked how Carmin died but was voluntarily explaining in detail how he had spent his time the previous day. He also told the detectives that they would find his DNA on the carpet of Carmin's living room. At about 10 p.m., the investigators pointed out to the defendant that he had yet to ask how Carmin died; the defendant said he did not want to know the details.

At 11 p.m., investigators sought the defendant's consent to search his car and home. He signed a written consent for both searches and told the detectives, "I'll tell you what you're going to find in [the] car." The defendant explained that the detectives would find "Carmin's blood" and her fingerprints. No one had informed the defendant at that time that Carmin's death had been bloody or violent. The defendant also consented to the search of his computers both at home and at his office at Kansas State University.

The defendant went on to explain that Carmin had borrowed his car a few weeks ago when Ciara was ill so that Carmin could get medicine at Walgreens, because her car was blocked in by the defendant's vehicle when he was visiting. According to the defendant, Carmin suffered a horrible nosebleed on the way.

Although no one had informed the defendant how Carmin died, he told the police in his interview that he would not have done anything "like they were suggesting" because he was a "thinking man." He explained that if he were going to commit a homicide, he would do it with an airborne poison "or something really slick." He later stated that he was "having fun with this from a CSI perspective."

At about 12:30 a.m., the defendant agreed to provide the police with a written statement. He then asked a detective who came into the room whether there were cameras in the toll booths along I-70. When the officer answered that there were cameras, the defendant replied, "That's all I need to know."

When he completed his written statement, he told the detectives that something in the statement would cause them to look at it "with a raised eyebrow." He then stated that he failed to point out that he drove on I-70 the previous morning to look at pillow cases in Paxico.

About 3 a.m., the defendant explained that Carmin's blood would be in his house because Carmin had cut herself when trying to cut a piece of candy for Ciara on Halloween. He also explained that his blood would be found in her downstairs bathroom because when he was at Carmin's home after mediation on the previous Tuesday, he had picked a callus and had caused it to bleed. The detective then informed the defendant for the first time that Carmin had been murdered and that the murder had occurred in her own home.

Following the interview, the defendant left the police department without being charged.

Further consideration and investigation of the defendant's police interview undermined many of the explanations that he provided in his statement. Specifically, several acquaintances indicated that Ciara was not the type of child who wrestled or roughhoused. Fur-

thermore, no witness could verify the defendant's statement that Carmin was prone to nosebleeds.

Ciara's babysitter told the detectives that on the morning Carmin was murdered, the defendant had dropped off Ciara at least 30 minutes early. Furthermore, although the defendant had initially told the police officers in his interview that he was at home grading tests all morning, a number of his students at the university stated that he was grading the students' papers in class as they were turned in. The defendant's statements regarding his grading of tests were also inconsistent with his later statement during the interview that he had driven to Paxico to look at antique pillowcases.

DNA testing showed that all of the blood in Carmin's house belonged to the victim, with the exception of a drop of blood on the baseboard of Carmin's downstairs bathroom. This drop of blood contained at least two contributors—Carmin and an unknown male.

While there was a blood pattern found just inside the front porch that was consistent with a work boot or shoe, no such shoe was found, either in the vicinity of Carmin's house or at the defendant's home. No other impression was found.

In addition, a number of acquaintances informed the investigators of statements made by the defendant leading up to Carmin's death. The defendant had told a neighbor that he " 'would be better off if [Carmin] weren't alive.' " The defendant also made numerous statements to his best friend, GayLynn Crossley-Brubaker. Crossley-Brubaker explained that she had called the defendant on the evening of November 13 (the day Carmin was allegedly murdered) to discuss Thanksgiving plans and noted that the defendant seemed unusually upbeat.

On November 15, 2003, the defendant called Crossley-Brubaker and told her that Carmin was dead and that the police were treating him as a suspect. He also told his friend that he had cuts on his hands as if "holding a knife by the blade." He repeatedly said, " 'All I see is the blood, all the blood.' "

Crossley-Brubaker also questioned the defendant's indication that he had gone to Paxico to look at pillowcases on the morning of Carmin's death, because she had not known that the defendant

was interested in antiques and she did not think he would waste the gas on such a trip.

A search of the defendant's computer revealed that he had run several searches between October 8, 2003, and November 10, 2003, including: "colorless and odorless poison"; "homicide"; "poisoning and colorless and odorless and murder and perfect and tasteless"; "murder for hire"; "how to hire an assassin"; "how to kill someone quickly and quietly"; "the best way to kill someone"; and "eyedrops and murder and csi."

On November 12, 2003, the day before Carmin's death and the day after the defendant learned at custody mediation that Lima was moving to Lawrence and that eventually Carmin wanted to move with him and Ciara to California, the defendant conducted a search for "highway 40" and "Topeka." The links that followed illustrated how to drive from Topeka to Lawrence without using the Kansas Turnpike.

Ten months after her death, the State charged Thomas Murray with first-degree murder for killing Carmin. After a 4-week trial, the jury found the defendant guilty of first-degree murder. The court sentenced him to life in prison with the possibility of parole after 25 years. Murray now appeals his conviction.

## I. Prosecutorial Misconduct During Closing Argument

The defendant argues that the State committed prosecutorial misconduct during closing argument by misstating the evidence relating to the DNA analysis of the blood spot found in Carmin's bathroom and by misconstruing testimony of GayLynn Crossley-Brubaker.

The defendant did not object to either of the prosecutor's comments that he now claims were problematic. Ordinarily, a party must make a timely and specific objection to an alleged error in order to preserve the issue for appellate review. See K.S.A. 60-404; *State v. Anthony*, 282 Kan. 201, 206, 145 P.3d 1 (2006). However, when a defendant's claim for prosecutorial misconduct implicates his or her right to a fair trial, an appellate court reviews the alleged misconduct under the same analysis, regardless of whether an objection was made. *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d

261 (2006). We have found that a defendant's right to a fair trial is implicated when a prosecutor misstates facts or states facts not in evidence. See *State v. Conway*, 284 Kan. 37, 43-44, 159 P.3d 917 (2007); *State v. Ly*, 277 Kan. 386, 392-93, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004).

*Standard of Review*

Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, an appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *Swinney*, 280 Kan. at 779. In its plain error analysis, the appellate court considers three factors:

"(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence is of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors, unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman* [*v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) (conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial)], have been met. [Citations omitted.]" 280 Kan. at 779-80.

When a defendant claims that a prosecutor committed reversible misconduct, the prejudicial nature of alleged errors is analyzed in the context of the trial record as a whole. *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994).

*Discussion*

*Comments Regarding DNA Analysis*

According to the defendant, the prosecutor committed reversible misconduct when she stated during the State's initial closing argument segment that there was "[b]lood in the house. His [the defendant's] blood, her [Carmin's] bathroom. Defendant killed Carmin." The defendant asserts that this statement misrepresented

the results of the DNA tests relating to the blood stain on the floorboard of the bathroom, which were inconclusive as to whether the blood belonged to the defendant.

This court has previously explained that during "closing argument, the prosecutor may draw reasonable inferences from the evidence *but may not comment upon facts outside the evidence.* [Citation omitted.]" (Emphasis added.) *State v. McCray*, 267 Kan. 339, 351, 979 P.2d 134 (1999). More recently, the court stated:

> "The fundamental rule for closing arguments is that the prosecutor must confine his or her remarks to matters in evidence. It is clearly improper for the prosecutor to state facts that are not in evidence. When the prosecutor argues facts that are not in evidence, the first prong of the prosecutorial misconduct test is met, and an appellate court must consider whether the misstatement of fact constitutes plain error." *Ly*, 277 Kan. 386, Syl. ¶ 4.

The defendant argues that the prosecutor's statement during closing argument that his blood was found in Carmin's bathroom was a misstatement of the evidence. In particular, the defendant asserts that the prosecutor's statement was inconsistent with the report from the DNA analysis of the bloodstain found on the baseboard of Carmin's bathroom, which stated that no conclusion could be drawn as to whether the bloodstain matched the defendant's DNA.

The State counters that the question of whether the bloodstain in the bathroom matched Murray's DNA was a hotly contended issue of fact. The State points to testimony and other evidence indicating that the blood on the baseboard was Murray's, claiming that the prosecutor was free to argue reasonable inferences from that evidence—namely, that the defendant's blood was found in the bathroom. In addition, the State claims that any possible error in the statement was cured since the court instructed the jury that the remarks of counsel in closing arguments are not evidence.

Our review of the record in this case reveals that there was evidence to support the prosecutor's statement that the defendant's blood was found in Carmin's bathroom. A drop of blood containing male DNA was found at the baseboard. After conducting a Y-STR analysis to isolate the male DNA, Dr. Sudhir Sinha, who conducted the analysis of the bloodstain, testified that according to scientific

policies, the presence of one particular "peak" in the DNA of the bloodstain that did not match the defendant's sample, as well as the relatively weak nature of some of the peaks in the unknown sample, required Dr. Sinha to report that no conclusion could be drawn regarding the correlation between the unknown sample and the defendant's DNA. However, the doctor testified that the inconclusive results of the analysis were probably due to the location of the bloodstain—the bathroom baseboard—as a number of people would use that bathroom and the sample would be diluted and mixed over time. The doctor also testified that in his professional opinion and from his experience, the bloodstain DNA from Carmin's bathroom was consistent with the defendant's DNA:

"Q. [Prosecutor] Doctor, based on your experience, do you have an opinion with a reasonable degree of scientific certainty whether Tom Murray's DNA is consistent with the baseboard sample?

"A. [Dr. Sinha] Well, as far as our standard quality control we gave the result inconsistent, inconclusive. But as far as my experience looking at it and looking at the data and doing several times and always finding the fifteen there, and that it's my scientific opinion that, yes, he is not excluded, and the result looks consistent that out of the mixture he could be one of the person[s] there present."

In addition, the doctor testified that other DNA tests specifically excluded other men who could be connected to the bathroom, such as Lima, because the tests showed no correlation between the DNA samples. However, the defendant's sample resulted in a strong enough correlation to the unknown sample that scientific policies would not *exclude* Murray as a possible contributor—it was just not conclusive according to scientific standards.

Moreover, in his initial interview with the police after he learned of Carmin's death, the defendant stated that he would "guarantee that you'll [the police] find a drop of my [the defendant's] blood" in Carmin's bathroom. The defendant then explained that he had cut open a callus when he was at Carmin's house on the Tuesday before her death and had cleaned up the blood with a towel in the bathroom. The record indicates that the towel rack that would have held this towel (which was not found in the bathroom when Car-

min's body was discovered on Friday) was located directly above where the bloodstain was found on the baseboard.

We conclude that there was ample evidence in the record to support the prosecutor's argument that the defendant's blood was found in Carmin's bathroom. Thus, the prosecutor's comments were reasonable inferences based on the record and were within the wide latitude allowed prosecutors during closing argument. See *State v. Stano*, 284 Kan. 126, 151, 159 P.3d 931 (2007).

Our conclusion that the prosecutor's comments regarding the bloodstain were acceptable argument based on the record is further strengthened by the later statements of both the defense and the State during closing argument in this case. We note that the comment that the defendant alleges was erroneous was made near the close of the State's initial argument—before the defense's closing argument and before the State's rebuttal. Both the defense and the State argued regarding the bloodstain at length during the later portions of the argument, underscoring the factual bases on both sides of the issue. During its closing argument, the defense made the following assertions relating to the DNA and Y-STR analyses:

"DNA analysis is not a matter of guessing, DNA analysis is not a matter of a hunch. DNA analysis is not a matter of a guess. DNA analysis is not a matter of what is most convenient at the time that one is testifying about it, or arguing about it. DNA analysis is a scientific process that is used in courts across this country by jurors like yourself to make decisions of immense importance. The DNA analysis conducted by Dr. Sinha concluded in his report the following language: 'Additional peaks below threshold and peak imbalance suggest the presence of more than one male DNA donor in this sample.' And it goes on to conclude, 'Due to the low level nature of the sample and possible allele dropout resulting from degradation, no conclusion can be drawn regarding the suspect Thomas Murray and this sample.' "

The defense counsel then argued that the jurors should not believe Dr. Sinha's testimony where he stated that he believed the collected sample was consistent with the defendant's DNA, because this testimony was based on personal belief and not on the accepted scientific standards.

During rebuttal, the prosecutor had the opportunity to clarify his argument relating to the bloodstain and accompanying report, asserting:

"We talked about the DNA evidence. And this report's in evidence, and the Doctor told you every time they ran the tests, Murray's DNA matched here, here, one of the top spots here, here, here, here and here. The 18 was the only place it didn't match, and what he said was there is a baseboard, and that's what all the DNA people say, they say when you're swabbing the baseboard it's not unusual, doesn't mean all the DNA was deposited at the same time, when you're swabbing the baseboard, it wouldn't be unusual to get other DNA in there. That was the only marker that somebody else, the second male, was found at, that 18. All the other [markers] were Murray's, and what the doctor told you—

. . . .

"Look at the markers. Time and time again, Dr. Sinha told you he cannot exclude his [Murray's] blood and guess what, it's right where he said he bleeded blood, remember? Oh, I cut my [callus] and I dripped it, I dripped it on the towel right there, the towel that's missing from the ring that sits right here. There is the waste can. It's the identical place that he predicted in his interview that we'd find it."

The extended argument by both the defense and the State regarding the DNA testing illustrates that this was a highly contested question of fact and that the prosecutor's argument consisted of reasonable inferences based on the record in this case. We conclude that the prosecutor's statement did not constitute prosecutorial misconduct.

### Comments Regarding Crossley-Brubaker's Testimony

The defendant also argues that the prosecutor committed reversible misconduct by making the following statement during closing argument:

"[L]et's talk about GayLynn, who demonstrably is probably his [the defendant's] best friend. . . . His best friend, and what did the defense ask, 'Did it ever cross your mind, did it ever once cross your mind, that Thomas Murray could be involved?' She said, 'Yes.' She does believe he's involved, that's what she told you, his best friend. *His best friend thinks he's a murderer.*" (Emphasis added.)

The defendant argues that this statement was improper for two reasons. First, the defendant claims that the comment misstated Crossley-Brubaker's testimony. Second, the defendant argues that personal opinions regarding the guilt or innocence of a defendant should not be admitted into evidence, and for the same reason, comments on such opinion testimony are not proper for prosecutors during closing argument.

The testimony discussed by the prosecutor during closing argument was elicited during defense counsel's cross-examination of Crossley-Brubaker and the prosecutor's subsequent redirect examination of the witness. During cross-examination, defense counsel asked Crossley-Brubaker if the reason that she had never asked the defendant whether he killed Ross was because "no such thing ever even crossed [her] mind." Crossley-Brubaker responded, "I can't answer that question yes or no."

On redirect examination, the prosecutor explored the witness' answer in greater detail:

"Q. (By Mr. Bath) Did it ever cross your mind that he [the defendant] was involved in the homicide?
"A. [Crossley-Brubaker] Yes.
"Q. And what was, when was that?
"A. Um, a couple of red flags.
"Q. No, when was it?
"A. When? On the 15th.
"Q. And did you do anything as a result of your thoughts?
"A. Yes.
"Q. What did you do?
"A. I went to the viewing to talk, to try to find out more information.
"Q. And at the end of the viewing, which would have been the 22nd or 21st?
"A. 22nd.
"Q. Did you do something?
"A. Yes.
"Q. What did you do?
"A. I contacted the Sheriff's Department.
"Q. Here?
"A. At Douglas County, yes."

Defense counsel initially objected to this line of questioning by the prosecutor, but the court overruled his objection on the basis that defense counsel had asked a similar question during cross-examination and so opened the door to the issue on redirect examination. The defendant does not appeal this ruling.

"No rule governing oral argument is more fundamental than that requiring counsel to confine their remarks to matters in evidence. The stating of facts not in evidence is clearly improper." *State v. Bradford,* 219 Kan. 336, 340, 548 P.2d 812 (1976). Although "a prosecutor may not misstate the facts in evidence," we have already

explained that "a prosecutor is permitted to draw reasonable inferences from the evidence and is given latitude in drawing those inferences." *Stano*, 284 Kan. at 151; see also *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 (2000) (stating that the law recognizes a prosecutor must be allowed "the freedom to craft an argument that includes reasonable inferences based on the evidence"). When a defendant claims that a prosecutor committed reversible misconduct, the prejudicial nature of the alleged errors is analyzed in the context of the trial record as a whole. *Whitaker*, 255 Kan. at 134.

Crossley-Brubaker testified on cross-examination that it had "cross[ed] [her] mind" that Murray was "involved in the homicide." She explained that after her concerns were not put to rest at Carmin's visitation, she contacted the Douglas County Sheriff's Department. Contrary to the defendant's contention on appeal, we find that the prosecutor's argument that Crossley-Brubaker thought Murray was "a murderer" is a reasonable inference based on the witness' testimony.

Our review of the defendant's second argument relating to the prosecutor's statement—that it was improper to base closing argument on improperly-admitted opinion testimony—leads us to conclude that this contention is also without merit. It is notable that the defendant does not appeal the trial court's determination that Crossley-Brubaker's testimony was admissible since the defense had opened the door on cross-examination. It appears that the defendant is attempting to circumvent the fact that Crossley-Brubaker's statement originated during cross-examination by asserting that even though the statement was in evidence due to actions by defense counsel, the prosecutor should be precluded from arguing that evidence since opinion testimony is unreliable. Such an argument is not supported by Kansas law.

Instead, we have held that no prejudicial error occurs—including prosecutorial misconduct—where the questionable statements are provoked and made in response to prior arguments or statements by defense counsel. *State v. Elnicki*, 279 Kan. 47, 64, 105 P.3d 1222 (2005). Although defense counsel did not (understandably) mention Crossley-Brubaker's testimony during closing argument, it was the defense's actions that introduced the witness' in-

itial statement regarding the defendant's guilt. It was therefore not improper for the prosecutor to argue inferences based on that testimony during closing argument.

For these reasons, we conclude that the prosecutor's statement that Crossley-Brubaker thought the defendant was "a murderer" did not constitute prosecutorial misconduct.

## II. TESTIMONY REGARDING THE DEFENDANT'S POST-*MIRANDA* SILENCE

The defendant argues that the trial court erred when it permitted the State to recall a police officer witness to testify regarding the defendant's post-*Miranda* silence.

Detective Patrick Pollock, a police officer who was present during the defendant's interview with police on November 14, 2003 (the night he learned that Carmin was killed), testified that although the defendant told the police during the interview that the bruises on his wrists came from roughhousing with Ciara, the detective's later investigation revealed that Ciara did not like to roughhouse. On cross-examination, the following exchange took place between defense counsel and Pollock:

"Q. [Defense counsel] . . . Now, you were asked about an injury to [*sic*] Ciara in the right hand of Mr. Murray, his right index, and am I correct that the investigation that you have done to determine whether or not that's happened is whether or not Ciara roughhoused with some other people?
"A. [Pollock] We asked that question of some people, yes.
"Q. Okay. Did you ever ask Tom how he played with Ciara?
"A. I don't believe we did, no.
"Q. You think that might have been instructive?
"A. It could have been."

Following Pollock's cross-examination, the State approached the court and requested whether it could recall Pollock to testify that the reason that he never asked the defendant those questions was that the defendant had declined to speak with the police on the advice of his attorney. According to the State, the phrasing of defense counsel's question on cross-examination—"*Did you ever* ask Tom how he played with Ciara?"—opened the door to this testimony, since it implied that the State had conducted a less-than-

thorough investigation. (Emphasis added.) The court agreed with the State's argument, explaining:

"[T]hat question [referring to the question on cross-examination] apparently has a lot of relevance to you [defense counsel] whether or not he ever investigated anything other than talking to the baby-sitters, that was important. You ended on that just about, you thought that was a really important point. Therefore it does have significance, and whether or not the police officer was competent and did a thorough investigation is clearly an issue that you intend to—I mean in opening argument, you talked about it, so I mean I think it's an issue in this trial and I think they [the State] can, as I say, very carefully crafted question, ask [why the detectives did not interview the defendant again]."

The trial court noted that the State would be allowed to recall Pollock later to testify on that point, as long as the line of questioning was "very limited." The court granted defense counsel a standing objection to Pollock's expected testimony.

When the State recalled Pollock as a witness several days later, the following exchange took place:

"Q. [Prosecutor] You recall when you testified you were asked by the defense whether you had ever spoken to Murray regarding injuries to his hand and whether Ciara caused them?
"A. [Pollock] Yes.
"Q. After your 11/14/03 interview of Murray, did you attempt to interview him again?
"A. Yes, we did.
"Q. And why would you want to speak with him again?
"A. Well, we had investigated some of his statements, we wanted to do a follow-up interview and go over those, the findings that we had found.
"Q. Were you successful?
"A. No.
"Q. And why not?
"A. On advice of counsel he was no longer available to be reinterviewed."

The defendant argues that this last statement—"On advice of counsel he was no longer available to be reinterviewed"—impermissibly referenced his post-*Miranda* silence in violation of the United States Constitution.

*Standard of Review*

Questions regarding the admission of evidence are generally reviewed for an abuse of discretion. See *State v. Thomas*, 252 Kan.

564, 572, 847 P.2d 1219 (1993). However, we have recently explained that judicial discretion

" 'varies, depending on the character of the question presented for determination. A district court's decision is protected if reasonable persons could differ about the propriety of the decision, as long as it was made within and took into account the applicable legal standards. If, among other things, a district court's decision goes outside the legal framework or fails to properly consider statutory limitations, it constitutes an abuse of discretion.' [Citation omitted.]" *State v. Miller*, 284 Kan. 682, 689, 163 P.3d 267 (2007).

For this reason, the question of whether an evidentiary ruling violated the defendant's constitutional rights is reviewed de novo. See *State v. White*, 279 Kan. 326, 332-33, 109 P.3d 1199 (2005) ("while we have said that the admissibility of evidence is often within the discretion of the district judge, constitutional considerations still prevail"). An exercise of discretion that results in an error of constitutional magnitude is serious and may not be held to be harmless unless the court is willing to declare a belief that it was harmless beyond a reasonable doubt. *State v. McCarty*, 271 Kan. 510, 518, 23 P.3d 829 (2001).

*Discussion*

In *Doyle v. Ohio*, 426 U.S. 610, 619, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), the United States Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment [to the United States Constitution]." We have further explained:

"A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers but instead invoked his or her constitutional right to remain silent. [Citation omitted.]" *State v. Edwards*, 264 Kan. 177, 195, 955 P.2d 1276 (1998).

In *State v. Clark*, 223 Kan. 83, 87-89, 574 P.2d 174 (1977), this court determined that *Doyle* also prohibited prosecutors from commenting on defendants' post-arrest silence even after they had already made a statement to the police. The *Clark* court reasoned

that "[a]n accused may remain completely silent, and he is under no duty to volunteer his exculpatory story. Thus, he should be afforded the same right after some discussion with the police when he remains silent as to matters later asserted at trial." 223 Kan. at 89. Applying this rationale, *Clark* held that "*Doyle* prohibits a state prosecutor from impeaching a defendant's alibi defense told for the first time at trial, when the defendant carried on limited discussion with police after arrest, but remained silent as to matters subsequently asserted at his trial." 223 Kan. at 89.

The defendant argues that Pollock's statement during his recall testimony violated the defendant's Fourteenth Amendment right by commenting on the fact that he refused to be reinterviewed on the advice of counsel after he had received *Miranda* warnings. It is evident that Pollock's statement on redirect examination implicates the defendant's rights under *Doyle*, because the statement explicitly refers to the defendant's invocation of his right to silence. See *Edwards*, 264 Kan. at 196; *Clark*, 223 Kan. at 89. Thus, unless the State can demonstrate that the admission of the statement was otherwise warranted or that the admission was harmless beyond a reasonable doubt, the statement's admission constituted reversible error. See *State v. Mims*, 220 Kan. 726, 730-31, 556 P.2d 387 (1976).

The State provides two bases for its assertion that Pollock's statement did not violate the defendant's constitutional rights: (1) The defendant had already spoken at length with the police during his first interview (and therefore was not silent), and (2) the statement was made in response to defense counsel's questions that implied the State had not conducted a thorough investigation.

We note that the first basis asserted by the State—that the defendant could not claim a *Doyle* violation when he had already consented to an extensive interview with the police—is directly contradicted by this court's opinion in *Clark*, where the court held that a defendant "should be afforded the same right [under *Doyle*] after some discussion with the police when he remains silent as to matters later asserted at trial." 223 Kan. at 89.

However, we agree with the State's second contention that defense counsel's questions during cross-examination of Pollock

opened the door to the brief exchange between the prosecutor and the detective on redirect examination. The chief argument of the defense in this case was that the circumstantial nature of the State's case indicated that the State had not conducted a thorough investigation of Carmin's murder and had pinned the murder on the defendant. Defense counsel's questions during its cross-examination of Pollock carry this implication. After determining that the investigators had never asked the defendant how he played with his daughter, defense counsel asked, "You think that might have been instructive?" implying that the lack of additional questioning could be attributed to the detective's incompetence.

Furthermore, as the trial court noted below, the fact that defense counsel asked, *"Did you ever* ask Tom how he played with Ciara?" implied that the investigators could have (and should have) followed up their interviews of Ciara's babysitters with additional questions to the defendant concerning the nature of the roughhousing with his daughter. (Emphasis added.) Again, the implication of defense counsel's questions was that the State failed to adequately investigate all of the information relating to the defendant's involvement in the murder.

A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal. *State v. Kesselring,* 279 Kan. 671, 693, 112 P.3d 175 (2005). We have previously applied this invited error analysis in a very narrow context when considering *Doyle* violations. See *State v. Gadelkarim,* 256 Kan. 671, 685-86, 887 P.2d 88 (1994), *disapproved on other grounds State v. Gunby,* 282 Kan. 39, 61-63, 144 P.3d 647 (2006) (disapproving of res gestae as a basis for admitting evidence of crimes or other civil wrongs independent of K.S.A. 60-455); *State v. Falke,* 237 Kan. 668, 682, 703 P.2d 1362 (1985), *disapproved on other grounds State v. Walker,* 252 Kan. 279, 297-98, 845 P.2d 1 (1993) (disapproving of language used in *Falke* with regard to instructions on voluntary intoxication). As the court recognized in *Gadelkarim,* "the invited error rule cannot be used as a pretext for the violation of a defendant's constitutional rights where there is no justification for so doing. [Citation omitted.]" 256 Kan. at 685.

In *Falke*, this court reviewed the murder and kidnapping convictions of the co-defendants Falke and White. At trial, White's defense counsel asked the investigating detective during cross-examination to read from a report summarizing the detective's initial interview of White. This report indicated that White told the officer at the time of arrest that White did not remember what happened when the crime took place because he was intoxicated. White later testified on his own behalf, explaining in detail the events surrounding the murder, but claiming that he was not involved in the murder and was merely present. White made no reference to being unable to remember what happened. 237 Kan. at 681.

The prosecutor asked White on cross-examination why he had not told the police this story when he first talked with them; White replied that he was "scared." 237 Kan. at 681. The defense counsel objected, arguing that the prosecutor had impermissibly commented on White's post-arrest silence. 237 Kan. at 682.

The *Falke* court examined the *Doyle* and *Mims* decisions, but concluded that the rule in those cases was inapplicable to the facts before it. The court first found that the facts did not present a *Doyle* issue, as the State was not impermissibly commenting on White's post-arrest silence, but was instead using White's previous statement during the initial interrogation to impeach his later testimony at trial. See *Falke*, 237 Kan. at 682. In addition, the State found that White could not prevail on his *Doyle* claim because "the defendant originally introduced the statements which he later objected to when the prosecutor sought to use them to impeach the defendant. The defendant may not invite error and then complain of that error on appeal. [Citation omitted.]" 237 Kan. at 682.

In *Gadelkarim*, defense counsel was cross-examining a police officer regarding his interrogation of the defendant and asked if the officer had determined whether the defendant could be interviewed after his arrest. The officer responded, " 'Eventually he invoked *Miranda*. He wanted to speak with his attorney prior to answering any questions.' " 256 Kan. at 684. Defense counsel immediately requested a hearing outside the presence of the jury and requested a mistrial on the basis of the officer's answer; defense counsel claimed he did not anticipate that the officer would re-

spond in a way that implicated the defendant's post-*Miranda* silence. The trial court denied the request for a mistrial, finding that defense counsel had a copy of the police officer's report where he indicated that the defendant had requested an attorney and also based on the State's representations that it would not address the officer's statement on redirect or during closing argument. 256 Kan. at 684.

This court affirmed, noting that the statement was both invited and harmless. 256 Kan. at 686. The court explained that the State did not rely on the officer's statement and "expressly agreed not to address the subject of Gadelkarim's silence on redirect." 256 Kan. at 686. In addition, the court found:

"Gadelkarim's complaint involves a single comment elicited by his own attorney on cross-examination, not by the prosecution. Evidence in the record reveals that defense counsel should have been aware of the potential of eliciting the very response of which the defendant now complains. Moreover, the strength of the evidence indicating Gadelkarim's guilt contravenes the argument that Gadelkarim was denied the right to a fair trial by the officer's statement that Gadelkarim had invoked his *Miranda* rights. The trial court did not err in denying Gadelkarim's motion for a mistrial." 256 Kan. at 686.

In *Gadelkarim*, we distinguished our ruling from the previous case of *State v. Higgins*, 243 Kan. 48, 49-52, 755 P.2d 12 (1988), *disapproved on other grounds State v. Warren*, 252 Kan. 169, 178, 843 P.2d 224 (1992) (rejecting the *Higgins* court's multiplicity analysis), where we declined to find that defense counsel invited a discussion of the defendant's post-*Miranda* silence even though the initial testimony regarding the defendant's invocation of that right occurred during the defense's cross-examination of a State's witness. Importantly, once statements regarding the defendant's invocation of his right to silence were admitted during cross-examination, the State explored the matter again during its redirect examination and then engaged in a lengthy discussion during closing argument of the defendant's failure to assert his innocence. 243 Kan. at 49-50.

The *Higgins* court found that the prosecutor's extended discussion of the defendant's post-arrest silence violated his constitutional rights. The court noted that "[a]s a general rule, a litigant

may not invite error and then complain of the error on appeal." 243 Kan. 48, Syl. ¶ 2. However, the court found that "[t]he invited error rule may not be used to excuse the actions by counsel during cross-examination or closing argument when such actions are ordinarily improper and erroneous, and are not a necessary or justified response to the actions of the other party in order to achieve a fair trial." 243 Kan. 48, Syl. ¶ 4. *Higgins* explained:

"In the present case, it is apparent that both the State and the trial court were aware that, ordinarily, no comment could be made regarding a defendant's post-arrest silence. Nor was there any necessity for the full exploration of the nature of the defendant's silence after his arrest and the State's comments during its closing argument. The sole motivation for the State's comments was the exploitation of the opportunity to utilize defendant's exercise of his Fifth Amendment *Miranda* rights against him. The present case does not involve a defendant who has invited or misled the court into error or who acquiesced in errors of the trial court. Nor did the defendant indulge in any improper or erroneous activities which required the State, in order to achieve a fair trial, to respond in kind. The cross-examination by counsel for the defendant was not an invitation to the State to violate defendant's right to due process. Rather, the State seized upon the opportunity to present evidence and arguments during closing which clearly violated the defendant's constitutional rights and were improper." 243 Kan. at 51-52.

We recently reached a similar conclusion to the *Higgins* rationale in *State v. Cosby*, 285 Kan. 230, 169 P.3d 1128 (2007). In that case, we held that the State's introduction of testimony by a police detective that the defendant had invoked his right to silence violated the defendant's constitutional rights under *Doyle*. 285 Kan at 244-46. In coming to this conclusion, we rejected the State's argument in that case that it was necessary to introduce the testimony regarding the defendant's invocation of his right to silence in order for the officers "to tell the jury they did not follow up on defendant's unsolicited statements because of the invocation." 285 Kan at 245. Instead, we held that the testimony was erroneous and should not have been introduced because "there was no need for the explanation the officers gave." 285 Kan. at 245. To compound the error, we found that "the State went beyond presenting the bare fact that defendant had previously invoked his rights" and "repeatedly asked about defendant's post-*Miranda* silence." 285 Kan. at 245-46. Under these circumstances, we held that the State's

action in eliciting the testimony was erroneous and rose to the level of prosecutorial misconduct. 285 Kan. at 246.

Our review of the testimony of Detective Pollock in this case leads us to conclude that this case is more akin to *Gadelkarim* and *Falke* than to *Higgins* and *Cosby*. Although the defendant did not explicitly introduce evidence relating to his refusal to be reinterviewed, defense counsel implicitly raised this issue when he asked Pollock, "*Did you ever* ask Tom how he played with Ciara?" (Emphasis added.) This question does not refer to a particular time frame, but instead implies that the detectives conducted a faulty investigation since they did not consult with the defendant after they had come across evidence that potentially conflicted with the defendant's interview statements. In particular, we find that defense counsel's following question—"You think that might have been instructive?"—underscored the defendant's argument that the detectives did not conduct a complete investigation.

In light of the specific facts of this case, we hold that defense counsel's questions during cross-examination of Pollock provided sufficient justification for the State's limited questioning of Pollock on redirect to the effect that the reason the detective did not ask the defendant additional questions concerning his wrestling with Ciara was that the defendant declined to be reinterviewed. We emphasize that the State's questioning of Pollock on redirect was limited and Pollock's response was scripted so as to minimize the effect on the defendant. The State did not mention the defendant's invocation of his right to silence at any other time during the trial and did not discuss that invocation during the State's 2 hours of closing argument. Under these circumstances, we find that the detective's testimony on redirect examination merely responded to defense counsel's implications during cross-examination and thus was invited error and cannot be the basis for reversal.

We further note that even if we were to determine that the admission of Pollock's testimony regarding the defendant's post-arrest silence was erroneous under *Doyle*, such error was harmless.

"In determining [harmless error in the *Doyle* context], we consider the nature and extent of the comment in comparison with the strength of the evidence of the defendant's guilt as well as whether the evidence was manifestly intended or

was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the defendant to testify. [Citation omitted.]" *Edwards*, 264 Kan. at 196.

Moreover, when considering whether a *Doyle* error is harmless or prejudicial, "each case must be scrutinized and viewed in the light of the trial record as a whole, not on each isolated incident viewed by itself. [Citation omitted.]" *State v. Hernandez*, 284 Kan. 74, 95, 159 P.3d 950 (2007).

The defendant claims that Pollock's statement cannot be harmless, because the court did not provide a limiting instruction indicating that the statement should only be viewed for the limited purpose of demonstrating the State's investigatory efforts. The defendant compares this case to *Gunby*, 282 Kan. at 57, where this court reiterated that evidence of crimes or civil wrongs admitted under K.S.A. 60-455 must be accompanied by a prophylactic limiting instruction.

We have never held that a limiting instruction is required in cases involving a defendant's post-arrest silence under *Doyle*. However, even if such a requirement existed, the defendant did not request such an instruction below. Thus, the trial court's failure to provide such an instruction would be reviewed for clear error. See *State v. Cooperwood*, 282 Kan. 572, 581, 147 P.3d 125 (2006). " 'Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred.' [Citations omitted.]" *State v. Trotter*, 280 Kan. 800, 805, 127 P.3d 972 (2006).

We note that although the court did not provide any instructions regarding the proper use of the defendant's post-arrest silence, it did provide an instruction regarding the defendant's right against self-incrimination. This instruction stated:

"A defendant in a criminal trial has a constitutional right not to be compelled to testify. You must not draw any inference of guilt from the fact that the defendant did not testify, and you must not consider this fact in arriving at your verdict."

Even though this instruction did not explicitly refer to post-arrest silence, it explains that a defendant is not compelled to testify. The

reasonable inference from this statement, which was the basis of the Supreme Court's decision in *Doyle*, is that a defendant is not required to incriminate himself or herself at any stage in the criminal proceedings. While an additional instruction relating to a defendant's pretrial statements might have edified this conclusion, one cannot say that the jury would have rendered a different verdict if such an instruction would have been included.

More importantly, we find that Pollock's testimony on redirect examination was limited to a very brief explanation of why the police originally desired an additional interview with the defendant and why that interview was not successful. Neither the prosecutor nor Pollock commented on the implications that may arise from such a refusal. In fact, on recross-examination, Pollock agreed that there was nothing wrong "with a citizen retaining counsel when he or she is being made the suspect of a first-degree murder case based on suspicion, a hunch, an intuition." Moreover, no mention was made of Pollock's redirect testimony during closing argument. The incident was therefore limited to the very brief recall of the witness by the State and the defense's single-question recross-examination. We find that Pollock's statement was not "manifestly intended or . . . of such character that the jury would naturally and necessarily take it to be a comment on" the defendant's invocation of his right to silence. *Edwards*, 264 Kan. at 196.

Under these circumstances, it seems clear beyond a reasonable doubt that the statement " 'had little, if any, likelihood of having changed the result of the trial.' [Citation omitted.]" *State v. Brown*, 280 Kan. 65, 77, 118 P.3d 1273 (2005).

III. ADMISSION OF HEARSAY STATEMENTS OF THE VICTIM

The defendant argues that the trial court erred by admitting previous statements made by Carmin through the testimony of Carmin's mother and of an attorney with whom Carmin consulted concerning possible custody litigation. The defendant contends that these statements were inadmissible hearsay and did not fit within any recognized exception to the hearsay rule.

Testifying as a witness for the State, Carmin's mother described an incident in 1997 when she and Carmin went shopping together. The mother explained:

"A. . . . We had gone shopping, just she and I, and I was driving the car home on the freeway and we were discussing our shopping or whatever we had done, and I said, 'Seems to me that you have to justify everything that you do'; and she broke out, 'Baha.' And I'm driving along and I looked at her because I didn't know what was going on, and she was actually crying, and stopped herself very quickly and said, 'I'm all right,' and I didn't interfere with that information because I wasn't going to interfere with their marriage and their choices and what they did. It just surprised me a great deal.

"Q. Did she say anything to you about your observations?"

At this point, Murray's counsel objected on the basis of hearsay. The court found that the question did call for hearsay, but overruled the objection because the answer went to the "[r]elationship of the parties." The prosecutor then resumed questioning:

"Q. (Ms. Wilson) What did Carmin tell you about your comment?

"A. She indicated that I was correct."

Later in the trial, over defense counsel's objection, Anne Miller—a lawyer Carmin consulted regarding possible custody litigation over Ciara—read at length from e-mails that Carmin had sent her regarding the ongoing custody mediation between Carmin and the defendant. Miller also testified regarding her conversation with Carmin after the last mediation session on November 11:

"She [Carmin] said that the dynamics of the communication between her and Dr. Murray had changed dramatically, that she had become much more forceful in her position of obtaining primary residential custody of Ciara, that Larry Lima was in fact going to move to Lawrence. She—apparently Dr. Murray asked her if this was on a short-term or long-term basis, and she said it would be a short-term basis, and she made it clear what her plan was with respect to moving to California with Mr. Lima."

The court permitted this testimony, finding that it demonstrated "the deterioration of the relationship" between Carmin and the defendant during the custody mediation.

On appeal, the defendant contends that Carmin's statements to both her mother and Miller were hearsay and that the explanation provided by the trial court for its admission of the witnesses' testimony—that it went to the "relationship of the parties"—is not a recognized hearsay exception. The defendant points out that the "relationship of the parties" rationale was one of the avenues by

which courts had until recently allowed parties to present evidence of crimes and civil wrongs independent of K.S.A. 60-455. This court explicitly disapproved of the "relationship of the parties" rationale for presenting K.S.A. 60-455 evidence in *Gunby*, 282 Kan. 39.

The State asserts that Carmin's previous statements were relevant and were not inadmissible hearsay. The State also contends that the defendant should not be permitted to object to the admission of these statements as hearsay since he was charged with murdering the declarant.

## Standard of Review

An appellate court reviews a trial court's admission of hearsay statements for an abuse of discretion. *Miller*, 284 Kan. at 708. " 'The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.' " *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005) (quoting *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 [1996]).

## Discussion

Before addressing the merits of the defendant's hearsay argument, we first consider the State's contention that the defendant waived any objections to the admission of Carmin's statements at trial because he was charged with her murder. In support of this assertion, the State cites *State v. Meeks*, 277 Kan. 609, 614-16, 88 P.3d 789 (2004), where we discussed the doctrine of forfeiture of confrontation rights by wrongdoing. There, we explained:

" 'The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own [the accused's] wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts. It grants him the privilege of being confronted with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot insist on his privilege. If, therefore, when absent by his procurement, their evidence is supplied in some lawful way, he is in no condition to assert that his constitutional rights have been violated.' " 277 Kan. at 614-15 (quoting *Reynolds v. United States*, 98 U.S. 145, 158, 25 L. Ed. 244 [1879]).

*Meeks* additionally found that "a waiver of the right to confrontation based upon the procurement of the absence of the witness also constitutes a waiver of any hearsay objections to prior statements of the absent witness." 277 Kan. at 615.

In *Meeks*, we noted that the doctrine of forfeiture by wrongdoing could apply to allow a victim's statements during the trial where the defendant is charged with murdering the victim or otherwise procuring his or her unavailability. 277 Kan. at 615-16. However, we stated that before a court could find that an accused had forfeited his or her confrontation rights and waived any hearsay objection regarding an unavailable victim's statements, the trial court must make a determination by the preponderance of the evidence that the accused brought about the unavailability. See 277 Kan. at 615-16. As the court explained:

" 'If the trial court determines as a threshold matter that the reason the victim cannot testify at trial is that the accused murdered her, then the accused should be deemed to have forfeited the confrontation right, *even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable.*' " 277 Kan. at 615.

Here, the trial court made no such determination; instead, it merely found that the statements were admissible to show the deteriorating relationship between Carmin and the defendant. The case is therefore distinguishable from *Meeks*, where, although the trial court did not explicitly state that Meeks killed the victim and thus waived his objection to the admission of the hearsay, it nevertheless made findings on the record indicating that it had come to such a conclusion. See 277 Kan. at 616.

Because the trial court did not make the requisite threshold determination in this case, we find that the defendant did not waive his hearsay objections to Carmin's statements. Nevertheless, we find that these statements were admissible under K.S.A. 2006 Supp. 60-460(d)(3).

K.S.A. 2006 Supp. 60-460 defines hearsay as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." Such evidence is inadmissible unless it falls under a recognized hearsay exception. "The theory behind the hearsay rule is that

when a statement is offered as evidence of the truth asserted in it, the credibility of the asserter is the basis for the inference, and therefore the asserter must be subject to cross-examination. 6 Wigmore on Evidence § 1766 (Chadbourn rev. 1976)." *State v. Harris*, 259 Kan. 689, 698, 915 P.2d 758 (1996).

At oral argument, the State's counsel acknowledged that both Carmin's statement to her mother and her statements to her attorney, Anne Miller, were offered to prove the truth of the matter discussed therein—that the defendant and Carmin's marriage was not always happy due to the defendant's controlling nature and that the ongoing custody dispute over Ciara was becoming heated, particularly after Carmin told the defendant of Lima's plans for a temporary move to Lawrence. Because the State offered these statements to prove the truth of the matter asserted, we must determine whether they were admissible under one of the exceptions to the hearsay rule provided in K.S.A. 2006 Supp. 60-460.

We note at the outset that the reasoning provided by the trial court for admitting the evidence in question—to show the relationship of the parties—is not one of the exceptions to the hearsay rule listed in K.S.A. 2006 Supp. 60-460. Until recently, Kansas courts recognized a "relationship of the parties" exception to K.S.A. 60-455, which deals with the proper use of evidence of crimes and civil wrongs, that allowed parties to introduce evidence of a discordant relationship independent of that statute. See *Gunby*, 282 Kan. at 51-57. *Gunby* explicitly abolished this exception, holding that the admission of all evidence of other crimes and civil wrongs must be analyzed under K.S.A. 60-455. See 282 Kan. at 57. Because the trial court in this case admitted all of Carmin's hearsay statements on the basis that they demonstrated the relationship of Carmin and the defendant, the defendant argues that our analysis in *Gunby* demands reversal.

We recognize that the rationale provided by the trial court regarding the admissibility of Carmin's statements was improper, as K.S.A. 2006 Supp. 60-460 does not include an exception for evidence relating to marital relationships. However, the defendant's argument based on *Gunby* is equally incorrect. Our analysis in *Gunby* with regard to evidence of the relationship between the

parties *only* applies to evidence of other crimes or civil wrongs. See *Gunby*, 282 Kan. at 55 (the "marital discord exception to K.S.A. 60-455 . . . now covers [prior to *Gunby*, that is] many violent relationships—between husband and wife, between separated and divorced spouses, between cohabitant and noncohabitant lovers, even between neighbors who have had a sexual relationship"). The testimony of Carmin's mother and Miller did not indicate the existence of an abusive or violent relationship between Carmin and the defendant. Rather, the testimony of both women indicates that, contrary to the defense's assertions and the defendant's statements in his interview that he and Carmin were getting along very well, the relationship between Carmin and the defendant had longstanding serious rifts that were growing as the custody dispute continued. This is not the type of evidence that is barred by K.S.A. 60-455.

As a preliminary matter, we note that there is no question that Carmin's statements to her mother and to Miller were relevant in this case. See *Gunby*, 282 Kan. at 47-48 ("Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question."). The defendant asserted both during his interview with the police and through his counsel's argument at trial that the relationship between him and Carmin was congenial until her death. Moreover, although he claims that the statements were inadmissible hearsay and not admissible under *Gunby*, the defendant acknowledges in his brief on appeal that the evidence was relevant to demonstrate the relationship and thus to demonstrate motive. The question before us is whether this relevant evidence was inadmissible hearsay.

As we have previously stated, the trial court incorrectly ruled that Carmin's hearsay statements were admissible as evidence of the relationship of the parties. Nevertheless, if a trial court reaches the right result, its decision will be upheld even if it provided an incorrect reason or engaged in an improper legal analysis. See *State v. Hoge*, 283 Kan. 219, 225-26, 150 P.3d 905 (2007). Thus, we

consider whether the statements by Carmin were admissible under some other exception to the hearsay rule.

After reviewing the statements admitted in light of Kansas' hearsay rule, we find that Carmin's statements to her mother and to Miller were admissible under K.S.A. 2006 Supp. 60-460(d)(3). This section recognizes an exception to the hearsay rule "if the declarant is unavailable as a witness, [and the statement was made] by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort." K.S.A. 2006 Supp. 60-460(d)(3).

There is no question that Carmin, as a murder victim, was unavailable as a witness at the trial for that murder. See K.S.A. 60-459(g)(3). Thus, the question with regard to both groups of statements (the statements to her mother and the statements to her attorney) is whether the statements were made "when the matter [discussed] had been recently perceived [by Carmin] . . . while [Carmin's] recollection was clear" and whether the statements were made "in good faith prior to the commencement of the action . . . with no incentive to falsify or to distort." K.S.A. 2006 Supp. 60-460(d)(3).

First, with regard to Carmin's statements to her mother—that Carmin had to justify everything she did to the defendant during their marriage—these were made in response to her mother's question while they spent a day shopping. Carmin was currently married to the defendant and was thus speaking from experience with a clear recollection of their relationship. Moreover, this statement was made in 1998—5 years prior to Carmin and the defendant's divorce, and clearly long before Carmin's murder trial. We find that this statement was admissible under K.S.A. 2006 Supp. 60-460(d)(3).

Likewise, with regard to Carmin's e-mails to Miller during the course of the custody dispute, we note that Carmin sent each e-mail to Miller within a day of the mediation session with the defendant, illustrating that her description of the events at the mediation and of her discussion with Miller were fresh in her mind.

She provided the information to an attorney that she had been consulting in case the custody dispute went to litigation, so it does not seem that she would have an incentive to falsify or distort the information. Finally, although the last e-mail (which discussed the defendant's reaction to Carmin's news that Lima would be moving to Lawrence) did discuss her plans for obtaining custody, no custody litigation had been initiated at that time and, obviously, no murder investigation was underway. Thus, we find that Carmin's e-mails are admissible under K.S.A. 2006 Supp. 60-460(d)(3).

Because all of Carmin's statements were admissible under K.S.A. 2006 Supp. 60-460(d)(3), we find that the trial court did not err in admitting those statements into evidence at trial. See *Hoge*, 283 Kan. at 225-26.

Finally, we note that even if we were to determine that Carmin's statements did not fall into an exception under the hearsay rule, we would find that the admission of these statements was harmless. "Errors that do not affirmatively cause prejudice to the substantial rights of the defendant do not require reversal when substantial justice has been done. [Citation omitted.]" *State v. Ackward*, 281 Kan. 2, 23, 128 P.3d 382 (2006); see also K.S.A. 60-261. To determine whether a trial error is harmless error or prejudicial error, each case must be scrutinized and viewed in light of the trial record as a whole, not by viewing each isolated incident by itself. *State v. Abu-Fakher*, 274 Kan. 584, 613, 56 P.3d 166 (2002).

In this case, Carmin's statements to her mother and to Miller were harmless. Several other witnesses testified regarding the defendant's somewhat controlling nature and how this influenced his marriage. Moreover, the information contained in Carmin's e-mails to Miller—the details regarding the custody dispute, the fact that Lima intended to move to Lawrence; and that he, Carmin, and Ciara eventually planned to move to California—was presented at trial through a number of other witnesses and evidence. Most importantly, the defendant discussed the potential move and his reservations about that move at length during his interview with the police. We find that the admission of that information through another channel did not violate substantial justice.

The admission by the trial court of Carmin's statements was not error.

## IV. CUMULATIVE ERROR

The defendant claims that even if the errors he alleges in his brief on appeal do not individually require this court to reverse his conviction, the cumulation of the alleged errors denied him a fair trial. "Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction." *State v. Ackward*, 281 Kan. at 29. However, we need not undergo a cumulative error analysis when we have determined that no trial errors took place. See *State v. Humphery*, 267 Kan. 45, 64, 978 P.2d 264 (1999). Because we find that the defendant has failed to demonstrate that the trial court or prosecutor erred at trial, his claim of cumulative error also fails.

## V. SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE DEFENDANT'S CONVICTION

In his final argument on appeal, the defendant asserts that the evidence presented by the State was insufficient to support his conviction. In particular, he claims that the State's case against him did not rest on "concrete evidence," but instead relied on "speculation, inference, and hunches." The crux of the defendant's argument is that because there was no direct evidence linking him to Carmin's murder, his conviction was based "solely on inferences" and must be reversed.

### Standard of Review

When the sufficiency of the evidence is challenged on appeal, this court must determine whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Beach*, 275 Kan. 603, Syl. ¶ 2, 67 P.3d 121 (2003).

This court has previously recognized that "[c]onvictions based upon circumstantial evidence . . . can present a special challenge to the appellate court" in that " 'the circumstances in question must themselves be proved and cannot be inferred or presumed from

other circumstances.' " *State v. Williams*, 229 Kan. 646, 648-649, 630 P.2d 694 (1981) (quoting 1 Wharton's Criminal Evidence § 91, pp. 150-51 [13th ed. 1972]). Nevertheless, this court has repeatedly held that "whatever type of evidence is introduced in a criminal trial (whether it be termed direct, indirect, testimonial, circumstantial or a combination) the trier of fact must apply the same test to convict the defendant"—proof of guilt beyond a reasonable doubt. *State v. Wilkins*, 215 Kan. 145, 156, 523 P.2d 728 (1974).

For this reason, we have espoused that "[a] guilty verdict in a criminal case will not be disturbed on appeal if there is substantial evidence, even though the evidence is entirely circumstantial. [Citation omitted.]" *State v. Scott*, 271 Kan. 103, 107, 21 P.3d 516 (2001). As we explained in *Scott*:

"The probative values of direct and circumstantial evidence are intrinsically similar, and there is no logically sound reason for drawing a distinction as to the weight to be assigned to each. [Citation omitted.] When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of this court to weigh the evidence or pass on the credibility of witnesses. [Citation omitted.]" 271 Kan. at 107-08.

Moreover, "if the circumstances alleged to justify a finding of premeditation are adequately proven by evidence, and are not merely suppositions themselves, there is no impermissible stacking of inferences such that reversal is required." *State v. Rice*, 261 Kan. 567, 587, 932 P.2d 981 (1997). We note that the trial court in this case instructed the jury regarding this distinction, stating: "You may not find an element of a crime from an inference that is based solely upon an inference. However, you may draw reasonable inferences from facts established in the evidence."

*Discussion*

In order to convict the defendant of first-degree murder, the State was required to prove that Murray killed Carmin intentionally, on November 13, 2003, in Douglas County, and with premeditation. See K.S.A. 21-3401(a). Appellate courts reviewing claims of insufficiency of the evidence consider all of the evidence in the light most favorable to the prosecution to determine "if the

essential elements of a charge are sustained. [Citations omitted.]" *State v. Pratt*, 255 Kan. 767, 768, 876 P.2d 1390 (1994).

This is not the first time that we have been presented with an appeal from a first-degree murder conviction that was entirely based on circumstantial evidence. For example, in *State v. Flynn*, 274 Kan. 473, 485-86, 55 P.3d 324 (2002), we found that there was sufficient evidence to convict the defendant of first-degree murder, even when all of the evidence presented was circumstantial. As we explained in that case:

"The State presented evidence of Dana's opportunity to commit this crime. She left work shortly after noon on December 22, 1992, after having a telephone conversation with her lawyer, the bearer of bad news in terms of the custody battle. The evidence showed it was likely Dana knew through her attorney that Randy was home that day. Her own statements following the murder established that she had purchased fuel for her car and telephoned her mother from a pay-phone to arrange for someone to pick up the children. . . .

"Admittedly, there was nothing at the scene of the crime to link the murder to Dana. . . . However, the evidence of Dana's actions after the murder further strengthen the conclusion that the jury acted reasonably in convicting her. After Randy's murder, the evidence showed Dana had driven her car through an automatic carwash twice. This evidence was sufficient to allow the jury to arrive at a logical conclusion that Dana's car was soiled with either Randy's blood or dirt from the road. Further, the evidence showed that after the murder Dana stated Randy was an evil, wicked man who deserved to die.

"In considering the sufficiency of evidence to sustain a conviction, this court reviews all the evidence, viewed in the light most favorable to the prosecution. [Citation omitted.] In light of this standard, we are convinced a rational factfinder could have found, beyond a reasonable doubt, that Dana was guilty of the murder of Randy Sheridan." *Flynn*, 274 Kan. at 485-86.

Similar to *Flynn*, the evidence in the instant case linking the defendant to Carmin's murder is entirely circumstantial. There is no direct evidence linking Murray to the crime scene. However, the defendant clearly had the motive to commit the crime. The State introduced ample evidence of the defendant's increasing desperation regarding Ciara's custody proceeding, as well as evidence that Lima would be moving to Lawrence. The defendant discussed the custody dispute and the impending move in detail with the police during his 9½-hour interview the night he learned that Carmin had died, stating that he did not want Ciara to live in California

or to be the kind of dad who saw his daughter every other holiday and during the summer. By his own admission in an e-mail, the defendant felt like "an animal backed into a corner." The defendant indicated to a neighbor that life would be much easier if Carmin were dead. The Internet searches also demonstrate sufficiently that the defendant was contemplating a murder.

Moreover, just as was the case in *Flynn*, the defendant had the *opportunity* to commit the crime. There is a 4-hour gap between when, according to Ciara's babysitter's testimony, the defendant dropped Ciara off the morning of Carmin's death and when the babysitter brought her to the defendant's home after noon. The State demonstrated that even driving at an easy pace, this provided the defendant with enough time to drive from Manhattan to Lawrence, commit the murder, and drive home. Notably, no one can account for the defendant's whereabouts that morning. He did not go to the university to work, but rather stated that he stayed home to grade tests. However, even this story changed, as he later stated that he drove to Paxico.

Finally, although Murray attempted to account for the injuries on his hands and arms, the State produced evidence that the cuts were consistent with holding a knife by the blade when stabbing someone and that the bruises on his wrists were consistent with a rough struggle with a blunt object. In short, the State produced evidence that the defendant suffered wounds consistent with those that would have been suffered by Carmin's attacker, who inflicted 11 blows to the victim with a blunt object, retrieved a knife from Carmin's kitchen, and stabbed her 13 times in the neck and back.

From this evidence, we find that there was sufficient evidence for a jury to find that the defendant killed Carmin Ross intentionally, that the murder was premeditated, and that the murder took place on the morning of November 13, 2003, in Carmin's home in Douglas County.

The defendant argues that because the State's case against him was based on entirely circumstantial evidence, the summary above is based only on inferences and thus cannot be used to prove his guilt. In essence, the defendant contends that because he provided exculpatory explanations for each of the pieces of evidence pro-

duced by the State, it would have been just as reasonable for the jury to infer that he was not guilty of the crime charged.

In raising this argument, the defendant applies an incorrect standard for this court's review. It is not the place of an appellate court to reassess the weight and credibility of the evidence presented at trial; that assessment is the onus of the jury. *Wisker v. Hart*, 244 Kan. 36, 37, 766 P.2d 168 (1988). Rather, we need only determine whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to support the conviction. See *Rice*, 261 Kan. at 586.

Although all of the evidence in this case was circumstantial, we find that the evidence is sufficient to support the defendant's conviction for first-degree murder.

The defendant's conviction for first-degree murder is affirmed.