IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,317

STATE OF KANSAS,
*Appellee*,

v.

KYLE VINCENT HARDWICK,
*Appellant*.

SYLLABUS BY THE COURT

1.

A lesser included instruction is factually appropriate when there is some evidence upon which a reasonable jury could convict the defendant of the lesser crime, even if that evidence is not strong or conclusive.

2.

Evidence supporting a lesser included instruction may come from any source, including the defendant's own testimony.

3.

Evidence sufficient to warrant a perfect self-defense instruction, which requires subjective and objective reasonableness, necessarily supports an imperfect self-defense instruction because the latter requires only a subjective reasonable belief, i.e., an unreasonable but honest belief, in the need for deadly force.

1

4.

When a preserved error implicates a statutory rather than constitutional right, the appellate court applies the statutory harmless error test, asking whether there is a reasonable probability the error affected the verdict in light of the entire record; the State bears the burden of showing harmlessness.

5.

A jury's conviction on a greater offense, despite being instructed on a lesser, supports an inference that omitting an even lesser instruction did not affect the verdict, though this inference is only one factor in a harmless error analysis.

6.

Under K.S.A. 60-404, a timely and specific objection is required to preserve evidentiary issues for appellate review; this statutory mandate forecloses use of judicial exceptions allowing unpreserved evidentiary claims.

7.

Appellate review of alleged evidentiary errors that implicate a constitutional right applies a substantial competent evidence standard to factual findings and de novo review to legal conclusions. If a violation is found, the constitutional harmless-error test under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), applies to determine whether the State has proved beyond a reasonable doubt that the error did not affect the verdict in light of the entire record.

8.

Under *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), the State may not use a defendant's post-*Miranda* silence as evidence of guilt or to impeach

credibility, except when the defendant "opens the door" by creating a misleading impression of cooperation with law enforcement, in which case narrowly tailored impeachment is permitted.

Appeal from Reno District Court; KEITH E. SCHROEDER, judge. Oral argument held October 30, 2025. Opinion filed January 16, 2026. Affirmed.

*Sean P. Randall*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Thomas R. Stanton*, district attorney, argued the cause, and *Kris W. Kobach*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.:  A jury convicted Kyle Hardwick of two counts of first-degree premeditated murder for killing Phil Anstine and Marion "Ed" Bates, two counts of theft, and solicitation of perjury. Hardwick directly appeals his murder convictions based on two alleged errors. First, he claims the district court erred by denying his request for a lesser included instruction of voluntary manslaughter based on a theory of imperfect self-defense. The imperfect self-defense theory stems from Hardwick's testimony that, after awakening disoriented and believing he had been sexually assaulted by Anstine, he confronted him, and Anstine responded by pointing a shotgun at him. Second, Hardwick claims the court erred by allowing the State to discuss his post-arrest silence, both before and after he was *Mirandized*. He argues these errors were not harmless and seeks a new trial.

For the reasons discussed below, we affirm Hardwick's convictions. Any error in failing to instruct the jury on imperfect self-defense voluntary manslaughter was harmless

3

in light of the entire record, which includes strong circumstantial evidence of premeditation to support the jury's verdict. Additionally, Hardwick's preserved evidentiary challenge to the admission of his post-*Miranda* silence is unavailing because he opened the door to this evidence and the State used it narrowly for the constitutionally permissible purpose of impeachment, not to infer his guilt.

## FACTUAL AND PROCEDURAL BACKGROUND

In the early evening on August 27, 2021, Reno County law enforcement were dispatched to a rural property several miles east of Hutchinson to investigate the reported disappearance of Anstine and Bates. Anstine owned the 1- to 2-acre property, which he and his friends called "the compound." The grounds included a crude cabin, a camper, a few primitive structures, a small pond or ditch, and several fire pits. According to multiple witnesses, Anstine and others went there to shoot, hike, camp, kayak, and to practice survival skills, while "liv[ing] off the grid." By all accounts, Anstine possessed multiple firearms, some of which he took out to the compound. There was also testimony that he stored hard currency there, such as silver and gold, in case of an economic collapse.

Bates' friends and family became concerned after not being able to reach him for a few days. The last known contact with Bates was on August 25 in the afternoon, when he texted a friend that he was going out to the compound to meet Anstine and a buddy "Kyle." Bates' friends checked his house and then drove out to the compound on August 26, where they encountered an unknown man who seemed "sketchy" and gave the name "Kyle." The man told them that Anstine and Bates left to buy cigarettes and had been gone about an hour and a half, but Bates' friends knew the nearest gas station was only 10

4

minutes away. Still not hearing from Bates by August 27, his friends and brother called police and requested a welfare check.

The man was gone when police arrived at the compound on the evening of August 27, as was Anstine's red Ford truck. Bates' Jeep was there and his wallet was on the console. While canvassing the area, officers discovered a decomposing body lying in the pond. The body had been covered with recently cut branches. Officers immediately secured the area and sought a search warrant.

Law enforcement executed the search warrant the next day, August 28. The body found in the pond was later identified as Bates. A blood sample matching his DNA was recovered from a large stain on the driveway, indicating he was fatally wounded there before being dragged to the pond. Law enforcement discovered Anstine's burned remains in a recently used fire pit, which had been covered with an unburned sheet of tin and a wooden pallet. The lack of blood or other biological matter outside the pit indicated Anstine died in or close to it. Other burned items were also recovered from the pit, including a shotgun; no additional firearms were located at the compound. Forensics determined both men had died by gunshot wounds—Anstine to the head and Bates to the head and chest—roughly 48 hours before their bodies were discovered, suggesting they were already dead by August 26 when Bates' friends visited the compound and inquired as to their whereabouts.

Investigators found several shotgun shells scattered in the area of the camper, fire pit, and driveway, as well as other potential signs of foul play. Black zip ties were found at various locations, including in the fire pit with Anstine's body and another in a line of trees off the driveway. A can of liquid propellant used to start a fire quickly was also recovered from the fire pit. And a pair of black gloves was found near the fire pit.

Investigators located a large metal box buried near the camper, which was partially covered in black plastic that appeared to have been torn open. The box was empty. Fresh dirt and sand were disturbed around the hole where the box was buried, and the site had been covered by a sheet of tin and a wooden pallet. Several witnesses testified that Anstine stored silver and gold inside a metal box just like this one. The shotgun recovered from the fire pit with Anstine's body matched the description of one he was known to keep in the box along with his silver and gold. Investigators did not find any silver or gold at the compound, at Anstine's residence, or at his known storage unit.

An interior search of the camper revealed a Social Security card, debit cards, and a Greyhound bus ticket belonging to Kyle Hardwick, along with other items attributable to his stay there, including a cigarette butt, a whiskey bottle, a Dollar General receipt for oatmeal cream pies, and several unopened packages of the oatmeal cream pies. DNA evidence found at the crime scene further implicated Hardwick. In particular, his DNA was located inside the black gloves found near the fire pit containing Anstine's body.

On August 31, a detective assigned to the case received a tip from Hardwick's girlfriend, Sherry, telling him that she had just received calls from Hardwick. Sherry provided the detective with the cell phone number Hardwick was currently using and reported that Hardwick told her, "Phil [Anstine] was my friend and he went down like a martyr." A man dating Sherry's daughter and living with them at the time also overheard Hardwick say, "I fucked up, baby."

On September 1, law enforcement traced the location of Hardwick's cell phone after it pinged in Maize. Local officers found Hardwick and took him into custody. They did not observe any signs that Hardwick was injured or in distress at that time, and he did

6

not mention anything of that nature to them. Reno County Detective Matthew Franklin and another detective met the Maize officers and took custody of Hardwick. They then transported Hardwick to the Reno County Sheriff's Department. The detectives testified that Hardwick did not mention anything about any injuries or being the victim of a sexual attack.

Once at the Reno County Sheriff's Department, Hardwick was placed in an interview room with a deputy for about 40 minutes while Detective Franklin prepared to question him. During that time, the deputy did not speak to Hardwick about the case and did not observe any signs of injury or distress from Hardwick. When Detective Franklin entered the room, Hardwick asserted his constitutional rights to remain silent and to counsel. Detective Franklin then advised Hardwick of his *Miranda* rights, and Hardwick again invoked his right to remain silent. Thereafter, officers did not ask Hardwick any questions about the case. The State charged Hardwick with two counts of first-degree premeditated murder and one count of theft.

Hardwick was held at the Reno County Correctional Facility while awaiting trial. On October 4, he placed a call to Sherry in which he was recorded saying he had "buried" his 401K somewhere and could go "dig it up."

Towards the end of October 2021, investigators located Anstine's truck abandoned at the edge of a farm about halfway between Hutchinson and Maize. The truck was parked up against a line of trees and partially covered by camouflaged fabric. Multiple firearms belonging to Anstine were found inside the vehicle worth an estimated $3,300-$3,500, as well as ammunition for those firearms and shotgun ammunition of the same brand found at the compound. Investigators identified Hardwick's palm and fingerprints inside the truck and found the keys to Bates' Jeep, Anstine's cell phone, and consistent

with items left in the camper at the compound, cigarette butts and an oatmeal cream pie package.

In May 2022, Hardwick was again recorded talking with Sherry during a jail phone call, this time attempting to dissuade her from complying with the State's subpoena to testify and suggesting, if she did testify, that she tell the court she previously lied about the phone conversations they had after the killings.

Subsequently, the State amended the complaint to add a charge of soliciting perjury and an alternative count of theft. The case went to trial in late January 2023. Hardwick testified at trial and admitted to killing Anstine and Bates but claimed he did so in self-defense. He testified to the following version of events.

On August 23, 2021, Hardwick boarded a bus from Kansas City to Hutchinson, arriving the next day. He said he had been arguing with his roommate and girlfriend, Sherry, and so decided to get away for a while by going to Hutchinson and visiting his good friend, Anstine. Hardwick had lived and worked in Hutchinson about 10 years prior and met Anstine through work. The two still visited each other occasionally and stayed in contact by phone calls, texts, and social media. Hardwick had been to the compound with Anstine many times and said they shared an interest in "end of world type scenario stuff."

When he arrived in Hutchinson on the morning of August 24, Hardwick walked to Anstine's house in town. Despite the unexpected visit, Hardwick said Anstine welcomed him warmly and invited him out to the compound. After socializing and running errands, they drove to the compound in Anstine's truck. Once there, Anstine helped Hardwick fire up the generator to run the AC inside the camper. Anstine then left for a couple of hours while Hardwick washed up and took a nap. According to Hardwick, Anstine returned

8

later that evening with pizza and beer, the apparent remnants of which were later recovered from a trash burn pit at the compound.

Hardwick stated he ate roughly a slice of pizza and drank half a beer, his only alcohol of the day, before becoming dizzy and nauseous. He told Anstine he was not feeling well and needed to lie down. After stumbling back into the camper, he fell into bed and passed out until late afternoon the next day, August 25. Hardwick testified that he woke up groggy, lying face down in bed, with his pants pulled down exposing his rear end. He noticed a bottle of lotion (or lube) near his head and felt pain coming from his anus. Photographic evidence confirmed the presence of a nondescript bottle near the TV in the camper.

Feeling disoriented, Hardwick said he exited the camper, got himself a drink, and looked around for Anstine or anyone else, but no one was there. He wanted to check in with Anstine and see if he knew anything about what happened. Hardwick stated Anstine soon showed up and was acting "real fidgety" and avoiding eye contact. Hardwick suspected Anstine was "high" on amphetamines because he was "really nervous" and "wasn't acting right." A toxicology report admitted at trial showed methamphetamine and amphetamine were present in Anstine's system at the time of his death.

Hardwick testified that he asked Anstine about what happened the night before, but Anstine avoided his questions, saying, "Look, let's forget about it, man. Let's go shooting." During this conversation, Hardwick claimed Anstine picked up a 12-gauge shotgun that was leaning against the camper. Growing more suspicious, Hardwick directly accused Anstine of raping him, and Anstine again tried to change the subject, saying, "No, just don't worry about it. Forget about it. Let's just go shooting." Hardwick

9

then stated, "No, man, you fucking raped me." At that point, Hardwick testified Anstine pointed the shotgun at him and insisted he not go to the police.

When Anstine pointed the shotgun at him, Hardwick said he "start[ed] freaking out" and told Anstine to "[j]ust calm down," but Anstine said "[n]o." Hardwick lunged for the weapon and quickly gained control of it. Hardwick said Anstine then drew a sidearm from his hip. Fearing for his life, Hardwick claimed he shot Anstine once with the shotgun from several steps away, killing him instantly.

After killing Anstine, Hardwick testified he was distressed and started walking towards the front of the camper when he suddenly encountered a man holding a pistol approaching from that direction. Hardwick said he did not know the man and had never seen him before that moment. According to Hardwick, the man fired a shot at him, and Hardwick fired back twice with the shotgun he was still holding, wounding the man on the first shot and killing him with the second. The man would later be identified as Bates.

Afterward, Hardwick testified that his nerves were shot and he felt paranoid, so he drank some whiskey and vodka and stayed in the camper until the next day. When he woke up on August 26, he proceeded to dispose of the bodies. Anstine's body was lying between the camper and a nearby fire pit. Hardwick dragged the body over to the fire pit, placed it on top of some debris, and used lantern fluid to light the debris on fire along with Anstine's body. Hardwick next approached Bates' body and went through the pockets looking for identification. Hardwick retrieved Bates' wallet and placed it in Bates' car. Hardwick then dragged Bates' body down to a small pond surrounded by trees and covered it with freshly cut branches that were lying around.

Hardwick explained that he burned Anstine's body because he was mad and felt betrayed that Anstine—who he thought was his friend—had drugged, raped, and pulled a gun on him. Hardwick had not burned Bates' body because he could not say Bates was involved in any way with the rape.

Hardwick said he did not call police to report these events because he had just been raped and did not want anyone to know what had happened to him, expressing concern that his son might see news about the events on the internet. He knew Anstine had lots of family and friends in the area and feared this information getting out. Also, given Hardwick's experience with law enforcement, he was afraid of having a bad encounter with police and getting shot. When questioned about why he did not call the police to investigate his claims of rape and self-defense, Hardwick said, "I don't believe the police would have been helpful to me at all."

Soon after Hardwick disposed of Bates' body in the pond, Bates' friends drove up. Hardwick lied and told them Anstine and Bates were in town getting cigarettes. Hardwick decided to leave the compound once Bates' friends were gone because he thought they would likely call police. He admitted to taking Anstine's truck but claimed Anstine had given him permission to drive it and that the firearms and ammunition were already inside. Hardwick said he took the handguns that Anstine and Bates had when they died and threw them out the window halfway between the compound and where he left the truck. He explained he left the truck with Anstine's firearms in a secluded location so that kids would not find it. He said his plan was to leave the county, turn himself in to law enforcement, and get an attorney to help prove his case. Instead, he hitched a ride to Maize, where he stayed for several days in a grain elevator before law enforcement picked him up.

11

On rebuttal, the State introduced evidence that Anstine's and Bates' deaths could not have occurred in the manner Hardwick described. Hardwick claimed Anstine was between him and the camper when he died and that the body lay there overnight. But the lack of blood and other biological matter outside the fire pit indicated Anstine was killed inside the fire pit and his body was burned soon after death. As to Bates' body, the lack of penetrating wounds on Bates' arms contradicted Hardwick's claim that he was pointing a weapon when he died. Investigators did not find any shotgun pellets where Hardwick claimed to have shot Anstine or any handgun bullet casings in the area where he claimed that Bates fired at him.

Additionally, Hardwick's recorded phone calls with Sherry conflicted with parts of his exculpatory testimony about the alleged rape and claim of self-defense and suggested motive and awareness of guilt. The State also admitted a screen shot of Hardwick's Facebook page predating these events (between January 1-August 25, 2021) with a caption that read, "If you can't hide a crime scene just pretend you are a victim."

The jury found Hardwick guilty of two counts of first-degree premeditated murder, both counts of theft, and one count of solicitation of perjury. The district court sentenced him to two consecutive hard 50 life terms of imprisonment with the other sentences running concurrent for at least 100 months.

Hardwick directly appealed his convictions to this court. Jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601); K.S.A. 22-3601(b)(3)-(4) (life sentence and off-grid crime cases permitted to be directly taken to Supreme Court); K.S.A. 21-5402(b) (first-degree murder is off-grid person felony).

ANALYSIS

I.  *Request for jury instruction on voluntary manslaughter based on a theory of imperfect self-defense*

During the jury instruction conference, Hardwick requested an instruction on voluntary manslaughter, as a lesser-included offense of first-degree murder, based on a theory of imperfect self-defense. The district court declined to give the instruction, explaining that under Hardwick's version of events he was either justified in acting in self-defense or, if the jury rejected that claim, guilty of first- or second-degree murder depending on its finding regarding premeditation. Hardwick argues the failure to give the requested instruction was error and that it was not harmless.

*Standard of review*

Appellate courts use a multi-step framework for analyzing jury instruction issues on appeal, as laid out in *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012):

> "(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012)."

*Preservation*

A defendant preserves a jury instruction challenge by requesting a specific instruction or by objecting to a proposed instruction and providing the grounds before the jury is excused to deliberate. See K.S.A. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection[.]"); *State v. Gallegos*, 313 Kan. 262, 267, 485 P.3d 622 (2021) (defendant's denied request for instruction on voluntary manslaughter properly preserved issue for appellate review).

The parties agree that Hardwick preserved this issue by requesting a voluntary manslaughter instruction, which the district court denied. During the jury instruction conference, defense counsel pointed to Hardwick's testimony that he acted in self-defense, stating, "I would ask for a voluntary manslaughter instruction because a jury very well could see this as some sort of inferred self-defense." In his brief, Hardwick concedes defense counsel misspoke when referring to a theory of "*inferred* self-defense" and asks this court to construe this statement "as a request for voluntary manslaughter based on *imperfect* self-defense." Despite the misspeak, the district court acknowledged the relevant testimony and expressed the proper standard:

> "If we look at the evidence as the defense has requested . . . or wants the jury to look at the evidence, it doesn't appear that he was unjustified shooting if he, in fact, was acting in self-defense. So looking at that evidence, he's either guilty of first degree murder or second degree murder letting the jury make a determination on the issue of premeditation or not guilty based on self-defense. I don't think it's appropriate in this situation to give an instruction, a lesser included instruction for voluntary manslaughter."

14

Both the context of the request and the court's response make clear the meaning was understood. This issue is thus properly preserved for review which means, if there is error, the standard of reversibility is harmless error. *Gallegos*, 313 Kan. at 266. We now consider whether the instruction was legally and factually appropriate.

*Legal appropriateness*

The parties agree that the requested instruction was legally appropriate because voluntary manslaughter is a lesser included offense of first-degree murder. Our caselaw establishes a requested instruction is legally appropriate on this basis alone. *State v. Thille*, 320 Kan. 435, 438, 570 P.3d 18 (2025) (voluntary manslaughter instruction legally appropriate as lesser included offense of first-degree murder); *State v. Pulliam*, 308 Kan. 1354, 1362, 430 P.3d 39 (2018) ("An instruction on a lesser included crime is legally appropriate."). Hardwick's requested voluntary manslaughter instruction was therefore legally appropriate.

*Factual appropriateness*

The parties disagree, however, on whether the requested voluntary manslaughter instruction was factually appropriate.

A lesser included instruction is factually appropriate if "there is *some* evidence which would reasonably justify a conviction of some lesser included crime." (Emphasis added.) K.S.A. 22-3414(3). In such cases, the court must instruct the jury on the lesser included crime. K.S.A. 22-3414(3) ("[T]he judge *shall* instruct the jury as to the crime charged and any such lesser included crime.") (Emphasis added.); *State v. Williams,* 295 Kan. 506, 521, 286 P.3d 195 (2012) ("[T]he giving of lesser included crime instructions is not a matter of discretion with the trial judge."). Thus, a defendant is entitled to an

15

instruction based on his or her theory of defense if there is *some evidence* that would justify a rational factfinding under that theory, even if that evidence is not strong or conclusive. See *State v. Anderson*, 287 Kan. 325, 333, 197 P.3d 409 (2008); *State v. Maestas*, 298 Kan. 765, 779, 316 P.3d 724 (2014). When a defendant requests a lesser included offense instruction, an appellate court reviews the evidence in the light most favorable to the defendant. See *Maestas*, 298 Kan. at 779.

Evidence to support a lesser included instruction may come from any source, including solely from a defendant's uncorroborated testimony. *State v. Salary*, 301 Kan. 586, 594, 343 P.3d 1165 (2015); *State v. Rodriguez*, 295 Kan. 1146, 1152, 289 P.3d 85 (2012); cf. *State v. Qualls*, 309 Kan. 553, 557-58, 439 P.3d 301 (2019) ("Even if the only evidence supporting the defendant's theory consists of the defendant's own testimony, which may be contradicted by all other witnesses and by physical evidence, the defendant may have met his or her burden" to justify a self-defense instruction.).

With these standards governing factual appropriateness in mind, we now must decide whether the evidence presented at Hardwick's trial warranted the requested voluntary manslaughter instruction based on a theory of imperfect self-defense. To address that question, it is first necessary to distinguish between perfect and imperfect self-defense. A complete, or "perfect," self-defense requires evidence of a subjective, honest belief that deadly force was necessary and that such belief be objectively reasonable under the circumstances. See K.S.A. 21-5222; *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 (2012). Imperfect self-defense, by contrast, requires only the first element—an honest, though unreasonable, belief that deadly force was necessary. K.S.A. 21-5404(a)(2); *Salary*, 301 Kan. at 598.

Here, the district court concluded that a complete self-defense instruction was warranted because, under Hardwick's version of the facts—that Anstine pointed a shotgun at him and that Bates began shooting as Hardwick approached—Hardwick satisfied the legal requirements for complete self-defense. Specifically, Hardwick testified that he honestly believed deadly force was necessary, and that belief was objectively reasonable under the circumstances.

At the same time, the district court determined that an instruction on voluntary manslaughter based on imperfect self-defense was not warranted. To justify such an instruction, there must be some evidence from which a rational jury could find that Hardwick killed Anstine and Bates while acting under an honest but unreasonable belief that deadly force was necessary. See K.S.A. 21-5404(a)(2); K.S.A. 21-5222.

The State argues this standard was not met, pointing to conflicting forensic evidence and the jury's rejection of complete self-defense. But the relevant question at the instruction stage is not whether the jury ultimately *would have* convicted Hardwick of voluntary manslaughter. Rather, the question is whether a jury *could have* convicted on the lesser offense, and if so, whether "some evidence . . . would reasonably justify" that conviction. See K.S.A. 22-3414(3).

The district court ultimately denied the requested imperfect self-defense instruction based on its conclusion that, under Hardwick's own version of events, there was no evidence he acted under an honest but unreasonable belief that deadly force was necessary.

The district court's decision to give a complete self-defense instruction while refusing to give an imperfect self-defense instruction is logically inconsistent. On the one

17

hand, the court found *some* evidence to support a complete self-defense instruction that requires an honest subjective belief that is also objectively reasonable. On the other hand, the court found *no* evidence to support an instruction that requires only an honest subjective belief, even if that belief was unreasonable under the circumstances. These findings cannot be reconciled because the mental state for perfect self-defense includes the subjective aspect of a defendant's belief, and imperfect self-defense allows for that belief to be unreasonable. We have previously interpreted the mental culpability standard for imperfect self-defense as a belief that would support a claim of perfect self-defense, if unreasonable but honest. See *State v. Roeder*, 300 Kan. 901, 923-24, 336 P.3d 831 (2014). Thus, evidence supporting a perfect self-defense instruction will generally also support a requested instruction for imperfect self-defense.

When evidence would reasonably support convictions on alternative offenses, this court has held it is the jury's task, not the district court's, to differentiate between degrees of culpability given the evidence. See K.S.A. 22-3414(3) ("In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any such lesser included crime."). Thus, while other evidence undermined Hardwick's account, weighing that evidence was the jury's function, not the district court's.

Here, Hardwick's testimony and the limited forensic evidence would reasonably justify a finding that he acted under an honest, though unreasonable, belief that deadly force was necessary. His statements that he "feared for his life" during both encounters support the subjective component, while the circumstances—particularly that he overpowered Anstine and that Bates was farther away—could lead a jury to find the belief unreasonable. Ultimately, whether that belief was honest but unreasonable presented a classic jury question.

18

Our precedent supports this conclusion. This court has found a voluntary manslaughter imperfect self-defense instruction is not factually appropriate when the record lacks *any* evidence to support it. See, e.g., *Thille*, 320 Kan. at 439 (voluntary manslaughter imperfect self-defense instruction not factually appropriate when defendant denied using deadly force); *State v. Harris*, 313 Kan. 579, 592-93, 486 P.3d 576 (2021) (voluntary manslaughter and self-defense instructions were not factually appropriate because there was no direct or circumstantial evidence of defendant's subjective belief that deadly force was justified); *Gallegos*, 313 Kan. at 269 (defendant's testimony that he "reacted without thinking" did not support a finding that the killing was done in the heat of passion to warrant a lesser included instruction of voluntary manslaughter since his other testimony and the rest of the evidence showed he acted with calculation). But that is not the case here, where there was at least "some evidence" to support Hardwick's theory.

Viewing the record in the light most favorable to Hardwick, his testimony that he feared for his life when both men brandished firearms was sufficient to warrant the requested instruction for imperfect self-defense voluntary manslaughter because it constitutes "some evidence which would reasonably justify a conviction of some lesser included crime" K.S.A. 22-3414(3). Because the district court found some evidence existed to support an instruction on perfect self-defense—a complete defense to homicide based on both an honest and objective belief that deadly force was necessary—it necessarily follows that some evidence existed to support an instruction on imperfect self-defense, which requires only an honest belief that deadly force was necessary. Accordingly, the voluntary manslaughter instruction based on imperfect self-defense was both legally and factually appropriate, and the district court erred in refusing to give it.

*Harmless error analysis*

Because we find error, the State must demonstrate there was no reasonable probability the error affected the outcome of the trial. Since Hardwick does not claim the district court's failure to give the instruction violated a constitutional right, we apply the statutory harmless error test under K.S.A. 60-261. See *Ward,* 292 Kan. at 569 (degree of certainty in instructional error analysis dictated by nature of alleged error; preserved nonconstitutional errors subject to statutory harmless error analysis). When an error concerns a statutory right rather than a constitutional one, we must determine whether there is a "'reasonable probability that error will or did affect the outcome of the trial in light of the entire record.'" *State v. Campbell*, 317 Kan. 511, 518, 532 P.3d 425 (2023) (quoting *McCullough*, 293 Kan. at 981-82).

The State argues that even if the voluntary manslaughter instruction were factually appropriate, the failure to give it was harmless under K.S.A. 60-261. The State points out that the jury—having been instructed on second-degree murder and perfect self-defense—nevertheless convicted Hardwick of premeditated first-degree murder, which shows it rejected his claim that he honestly believed deadly force was necessary. In essence, because the jury's verdict included factual findings inconsistent with imperfect self-defense, the State maintains there is no reasonable probability the missing instruction would have led to a different verdict.

When a jury is instructed on a lesser included offense but convicts on the greater offense, a reviewing court may infer that the failure to give an instruction on an even lesser offense did not affect the verdict. *State v. Nunez*, 313 Kan. 540, 553, 486 P.3d 606 (2021). This inference is not applied automatically or mechanically, but serves as one factor in determining whether the instructional error was harmless in light of the entire record. 313 Kan. at 553. As the State points out, the jury was instructed on both first-

degree premeditated murder and the lesser offense of second-degree intentional murder, as well as on self-defense as a complete defense to both charges. Despite being given the opportunity to find that Hardwick acted lawfully in self-defense or to convict on the lesser degree of intentional homicide without premeditation, the jury instead found him guilty of premeditated first-degree murder.

We acknowledge that Hardwick testified he was surprised and feared for his life when Anstine pointed a shotgun and then a pistol at him, and again when Bates began firing a handgun at him without warning. Yet physical evidence (and the lack thereof) at the crime scene contradicted Hardwick's version of the facts and supported a finding of premeditation. No ammunition from the handgun Bates allegedly fired at him was found at the scene. And no shotgun shells were found where Hardwick claimed to have shot Anstine. Forensic evidence also conflicted with Hardwick's version of the events regarding the distance, direction, and number of shots he fired, as well as Bates' posture and Anstine's location when they died.

Hardwick's actions after the killings further supported a finding of premeditation: concealing the bodies, misleading others who came looking for the victims, and evading law enforcement. Additional circumstantial evidence—such as the missing currency, stolen firearms, and testimony that Hardwick expressed remorse—suggested motive and consciousness of guilt.

Had the jury believed even part of Hardwick's testimony that he acted in fear or surprise, it could have convicted him of second-degree murder, an intentional killing without premeditation. Instead, the jury found that he acted with sufficient reflection and deliberation to commit premeditated murder. Given that finding, it is implausible to

21

believe the jury would have gone further to convict on voluntary manslaughter based on imperfect self-defense had that instruction been given.

When there is no reasonable probability that the jury would have returned a voluntary manslaughter verdict based on imperfect self-defense, this court has found the error harmless. See *James*, 309 Kan. at 1304 (expert and witness testimony that the fatal shot hit the victim in the back was antithetical to claim of perfect or imperfect self-defense; failure to instruct jury on involuntary manslaughter based on this theory in addition to unintentional second-degree murder was therefore harmless). Yet this court has also held such errors are not harmless when evidence of premeditation was weak. See, e.g., *Qualls*, 297 Kan. at 72 (jury instructed on first- and second-degree murder; defendant's testimony was consistent with theory of imperfect self-defense; factors supporting premeditation were sufficient to infer premeditation but not so abundant as to render voluntary manslaughter instruction error harmless).

This case falls between those precedents. Hardwick's claim of imperfect self-defense was not entirely disproved, but it was poorly supported, and the evidence of premeditation—particularly his conduct afterward—was strong. In such circumstances, this court distinguishes between a theoretical possibility and a reasonable probability that the failure to give a lesser instruction affected the outcome. *State v. James*, 309 Kan. 1280, 1304, 443 P.3d 1063 (2019) (A theoretical possibility does not overcome a highly improbable result.). Though in this case it is *theoretically possible* the jury could have rejected first-degree premeditated murder and second-degree intentional murder in favor of voluntary manslaughter based on a theory of imperfect self-defense if that instruction had been given, there is no *reasonable probability* it would have done so considering all the evidence. Thus, the district court's error in failing to give the requested instruction on voluntary manslaughter based on a theory of imperfect self-defense was harmless.

## II.   *Post-arrest silence*

Hardwick next contends that the district court erred by allowing the State to introduce evidence of his post-arrest silence—both before and after he was *Mirandized*. Hardwick asserts these evidentiary errors violated his rights under the Fifth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights and are not harmless.

### *Pre*-Miranda *silence*

Hardwick spends considerable space in his brief discussing the State's references to his pre-*Miranda* silence, which he claims violated his constitutional rights. Yet he concedes, and the record reflects, that he did not object to the admission of this evidence as required to preserve it for appeal under K.S.A. 60-404. Still, he asks this court to review the issue under a prudential exception for constitutional issues first raised on appeal, as a pure question of law arising on undisputed facts that is determinative of the case, or because consideration of the claim is necessary to prevent a denial of fundamental rights. See *State v. Parry*, 305 Kan. 1189, 1191-92, 390 P.3d 879 (2017) (discussing discretionary nature of preservation rule).

Hardwick misunderstands both the origin and the effect of the contemporaneous-objection rule. That rule, codified in K.S.A. 60-404, is a legislative mandate requiring a timely and specific objection to evidence at trial to preserve any issue arising from the admission or exclusion of that evidence for appellate review:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based
> thereon be reversed, by reason of the erroneous admission of evidence unless there
> appears of record objection to the evidence timely interposed and so stated as to make

clear the specific ground of objection." K.S.A. 60-404.

Because this rule is statutory, the judicially created exceptions that sometimes allow appellate review of unpreserved claims do not apply. See *State v. Sinnard*, 318 Kan. 261, 282, 543 P.3d 525 (2024) (explaining that extending review beyond the legislative mandate of K.S.A. 60-404, "even to conclude no error occurred—would be akin to an advisory opinion"); *State v. King*, 288 Kan. 333, 339-40, 204 P.3d 585 (2009) (holding contemporaneous-objection rule of K.S.A. 60-404 forecloses consideration of unpreserved evidentiary challenges on appeal). Therefore, Hardwick's evidentiary challenge to the admission of his pre-*Miranda* silence is not reviewable on appeal.

*Post*-Miranda *silence*

Hardwick next claims the district court violated his Fifth Amendment rights by permitting the State to introduce evidence of his post-arrest, post-*Miranda* silence for impeachment purposes. The court allowed this line of questioning after finding Hardwick had "opened the door" by testifying that he would have spoken with law enforcement if counsel had been present. Defense counsel objected to the ruling on grounds that it was the prosecutor's questions which had elicited this inadmissible evidence. Given this objection, the issue is preserved and properly before this court under K.S.A. 60-404 (contemporaneous objection rule).

*Standard of review*

Both parties cite the multi-step admissibility framework for reviewing evidentiary rulings, which generally involves (1) considering relevance, (2) determining which rules of evidence or other legal principles apply, and (3) analyzing whether the district court applied the appropriate rule or principle. An appellate court's review under this final step

24

depends on the applicable rule or principle. *State v. Tully*, 293 Kan. 176, Syl. ¶ 1, 262 P.3d 314 (2011).

Hardwick does not argue relevancy, so this step is waived. See *State v. Davidson*, 315 Kan. 725, 728, 510 P.3d 701 (2022) (A party waives or abandons arguments not made on appeal.); *State v. Reed*, 300 Kan. 494, 509, 332 P.3d 172 (2014) (failure to argue relevance of challenged evidence waives this step of the analysis). At the second step, Hardwick's preserved challenge is exclusively a legal question: whether admitting evidence of his post-*Miranda* silence violated his federal and state constitutional rights. Therefore, at the third step, this court reviews this issue de novo. 300 Kan. at 509 (determination of whether admission of evidence violates constitutional rights reviewed de novo); see *State v. Contreras*, 313 Kan. 996, 999, 492 P.3d 1180 (2021) (When reviewing challenges to evidentiary rulings based on a claimed Fifth Amendment violation, an appellate court reviews the district court's factual findings using a substantial competent evidence standard, but any legal conclusions are subject to unlimited review.).

Here, Hardwick alleges admitting evidence of his post-*Miranda* silence violated his constitutional rights under the Fifth Amendment and section 10 of the Kansas Constitution Bill of Rights. Thus, if this court finds that admitting this evidence was error, we must apply the constitutional harmless-error test under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), to determine whether the State has proved beyond a reasonable doubt that the error did not affect the verdict in light of the entire record. See *Ward*, 292 Kan. at 569-70.

*Additional facts*

During the State's cross-examination of Hardwick, the prosecutor asked about his actions in the aftermath of the killings. Specifically, the prosecutor asked Hardwick why he disposed of the handguns he claimed Anstine and Bates pointed at him when this evidence would have supported his self-defense claim. After stating, "I don't know," and, "I wasn't thinking clearly," Hardwick offered a longer response: "My plan was that we were going to get an attorney and work together so I could still help you find this evidence if you wanted it. You know, no one's came to talk to me about it."

Continuing the same line of questioning, the prosecutor asked Hardwick to identify more precisely where he had disposed of the guns. Hardwick responded that he could not do so without a higher resolution map of the area. Apparently referring to the night of Hardwick's arrest, the prosecutor then asked, "But you could have told the officers exactly where it was that night?" Hardwick responded, "I was willing to speak with officers as long as I had an attorney present." Based on that response, the prosecutor requested a bench conference, and the judge temporarily excused the jury.

During this recess, the prosecutor argued that Hardwick's testimony had misled the jury by suggesting he would have cooperated with investigators if he had an attorney present—an assertion that, in the State's view, implied law enforcement failed to conduct a thorough investigation. The prosecutor noted that the court had appointed three attorneys to represent Hardwick during the case, yet Hardwick never contacted law enforcement through any of them to provide information. On that basis, the prosecutor claimed Hardwick had "opened the door" for the State to use his post-*Miranda* silence for impeachment purposes. The district court agreed with the State and thus permitted the State to inquire about Hardwick's post-*Miranda* silence for that limited purpose. When

pressed, defense counsel objected to this ruling, claiming that it was the prosecutor's questioning—not Hardwick's testimony—that introduced evidence of his decision to remain silent and request counsel.

*Applicable law*

The Fifth Amendment to the United States Constitution guarantees a privilege against compulsory self-incrimination which applies to the states through the Fourteenth Amendment. U.S. Const. amend. V; *Malloy v. Hogan*, 378 U.S. 1, 6-11, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964). This court has held section 10 of the Kansas Constitution Bill of Rights affords at least as much protection against compelled self-incrimination as the Fifth Amendment. *State v. Faidley*, 202 Kan. 517, 520, 450 P.2d 20 (1969). As a prophylactic safeguard of Fifth Amendment rights, law enforcement must inform a suspect prior to custodial interrogation that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Once *Miranda* warnings have been given, the State is generally prohibited from introducing evidence of a defendant's post-*Miranda* silence because these warnings may induce silence and implicitly provide government assurance that a defendant will not be penalized for invoking a constitutional right. *Doyle v. Ohio*, 426 U.S. 610, 617-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976) (prosecutor's use of a defendant's post-*Miranda* silence to impeach the defendant's credibility violates the Due Process Clauses of the Fifth and Fourteenth Amendments); *State v. Mims*, 220 Kan. 726, 730, 556 P.2d 387 (1976) (same). Therefore, the State cannot use a defendant's post-*Miranda* silence against him or her as evidence of his or her guilt or, in general, to impeach an exculpatory statement

27

made for the first time at trial. 220 Kan. at 730.

Yet courts have long held that *Doyle* permits the State to use a defendant's post-*Miranda* silence to impeach credibility when a defendant's own testimony creates a misleading impression of cooperation with law enforcement; in that circumstance, the State may ask narrowly tailored questions to correct the impression. See, e.g., *Tully*, 293 Kan. at 187-88 ("'When a defendant attempts to convince a jury that he was of a cooperative spirit, *Doyle* does not tie the hands of prosecutors who attempt to rebut this presentation by pointing to a lack of cooperation.'") (quoting *United States v. O'Keefe*, 461 F.3d 1338, 1348 [11th Cir. 2006]). See also *Earnest v. Dorsey*, 87 F.3d 1123, 1135 (10th Cir. 1996) (reference to post-arrest silence allowed but only to rebut defendant's implication that he cooperated with police); *McMillan v. Gomez*, 19 F.3d 465, 469-70 (9th Cir. 1994) (proper for prosecutor to refute defendant's impression of police cooperation with evidence that defendant did not cooperate); *United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975) (prosecutor may question a defendant about his or her post-arrest silence for the purpose of rebutting the impression that he or she cooperated with law enforcement authorities).

Thus, as a limited exception to *Doyle*, prosecutors may reference a defendant's post-*Miranda* silence if the defendant first "opens the door" to this line of inquiry. See *Tully*, 293 Kan. at 191-92. This exception must be used judiciously and not as a pretext to violate a defendant's Fifth Amendment rights—there must be sufficient justification, and the prosecution must not stray from the grounds of impeachment to inference of guilt. 293 Kan. at 188, 192.

This court has held a defendant "opens the door" to limited admission of post-*Miranda* silence for impeachment purposes when the defendant implies he or she was of

a "cooperative spirit" to assist law enforcement with the criminal investigation or suggests the State conducted an inadequate investigation by not questioning the defendant to connect the evidentiary dots, even though the defendant had invoked *Miranda* rights. Our caselaw indicates the key factor in determining whether a defendant opens the door to this generally inadmissible evidence is when defense counsel's questioning or defendant's testimony, viewed in isolation, is blatantly inconsistent with the defendant's post-*Miranda* silence. See *Tully*, 293 Kan. at 193; *State v. Murray*, 285 Kan. 503, 526, 174 P.3d 407 (2008) (abrogated by several cases on other grounds).

In *Murray*, the defendant claimed bruises on his arms and hands resulted from rough-housing with his young daughter and were not proof of a physical struggle with his wife who died by blunt force trauma. The detective who interviewed the defendant's daughter testified that she reported not liking rough play. On cross-examination, defense counsel asked the detective whether law enforcement had asked the defendant how he played with his daughter and, in a leading manner, whether it would have been instructive to do so—implying the defendant could have provided useful information. Finding by this line of questioning that the defendant had opened the door to the issue of why law enforcement did not interview the defendant further, the trial court permitted the State to inquire about the defendant's invocation of *Miranda* and subsequent silence. 285 Kan. at 518-19. This court agreed, holding defense counsel's implication that the State "failed to adequately investigate all of the information relating to the defendant's involvement in the murder" allowed for admission of relevant testimony regarding the defendant's invocation of *Miranda*. 285 Kan. at 522.

That said, "even if a defendant cracks open a door, that opening may not be used to excuse the actions by a prosecutor . . . [that] are ordinarily improper, erroneous" or otherwise not necessary or justified. *Tully*, 293 Kan. at 192. Prosecutors go too far when

they goad or bait a defendant into testifying to a cooperative spirit, when they gratuitously reference a defendant's invocation of *Miranda* or post-*Miranda* silence beyond what is necessary for impeachment, and when they stray beyond impeachment to inference of guilt. See, e.g., 293 Kan. at 193 (impeachment not necessary where defendant's post-*Miranda* silence was not blatantly inconsistent with his trial testimony; prosecutor crossed the line by baiting the defendant into claiming he was cooperative); *State v. Cosby*, 285 Kan. 230, 245-47, 169 P.3d 1128 (2007) (prosecutor's repeated references to defendant's post-*Miranda* silence served no purpose other than to discredit defendant's affirmative defense and were therefore improper); *State v. Higgins*, 243 Kan. 48, 49-52, 755 P.2d 12 (1988) (defense counsel's cross-examination of law enforcement witness about defendant's statements during post-arrest interview did not justify prosecutor's extensive questioning about circumstances of defendant's invocation of right to remain silent on redirect and inferences of guilt during closing argument).

*Application of* Doyle *to the present facts*

To begin, we note that Hardwick frames his claim as a broad Fifth Amendment violation to which the *Doyle* framework is "largely inapplicable." Yet Kansas courts consistently apply *Doyle* to all claims involving post-*Miranda* silence, and the determinative question is whether Hardwick's testimony triggered that limited exception.

To answer that question, we evaluate Hardwick's *Doyle* challenge based on the trial record to determine: (1) whether he "opened the door" to the State's questioning regarding his post-*Miranda* silence for the limited purpose of impeachment, and (2) if so, whether the prosecutor stayed within the proper bounds when pursuing that line of questioning.

1. *Whether Hardwick "opened the door" to evidence of post-*Miranda *silence*

First, we consider whether Hardwick opened the door to the admission of evidence of his post-*Miranda* silence by suggesting that he was of a cooperative spirit to assist law enforcement with the investigation, in blatant conflict with the exercise of his actual (constitutionally protected) silence. After considering the record and Kansas caselaw interpreting *Doyle*, the district court found

> "the defendant has, in fact, opened the door to that. Normally this would be inadmissible evidence under *Doyle*, but under the circumstances the defendant has testified it was his plan to get an attorney and to tell his side of the story about acting in self-defense. Twice he has testified that he could help the officers find evidence of self-defense, but nobody came to talk to him about it which you know they're prohibited from talking to him about it after he's invoked his *Miranda* rights. Two times he testified to that. I think he's opened the door to, based on his testimony, being impeached by questions about his post-*Miranda* silence based on his testimony that it was always his intention but nobody came to talk to him when legally they couldn't."

As the district court noted, the trial transcript reveals at least two different times Hardwick clearly stated, not just implied, that he was willing and even intended to cooperate with law enforcement once he had an attorney. He also claimed law enforcement had failed to follow up to obtain the information he could have provided. In the context of the prosecutor's questioning about Hardwick's actions in the aftermath of the killings, particularly the disposal of potentially exculpatory evidence, Hardwick testified seemingly unprompted:  "My plan was that we were going to get an attorney and work together so I could still help you find this evidence if you wanted it. You know, no one's came to talk to me about it." When the prosecutor later posed a leading question that Hardwick could have told officers the location of the evidence on the night of his

arrest, Hardwick responded "I was willing to speak with officers as long as I had an attorney present."

The trial transcript reflects the prosecutor did not provoke Hardwick's first statement about planning to assist law enforcement in finding relevant evidence since there was no actual question posed, and the prosecutor did not follow up on Hardwick's statement. As to the prosecutor's suggestion that Hardwick could have provided the location of the evidence at the time of his arrest, the court found this line of questioning pertained to Hardwick's pre-*Miranda* silence, which is generally permissible. The record supports this conclusion since Hardwick was first detained by local law enforcement in Maize, then transferred to the Reno County Sheriff's Department, and still waited for a time before being *Mirandized*. Thus, it was not unfair for the prosecutor to ask why Hardwick did not supply this information when it could have been used to recover the potentially exculpatory evidence in question, before he was *Mirandized*. Although this question did prompt Hardwick's response that he was willing to speak with law enforcement once provided with an attorney, the prosecutor stopped short of inciting him into claiming a cooperative spirit. Hardwick could simply have answered, "Yes," or, "No," or just given an answer that did not refer to his *Miranda* rights. Hardwick's chosen response was especially misleading because, as the district court and the State pointed out, "he was appointed several attorneys in the course of this case and yet never came forward with this information until trial."

Importantly, this testimony is distinct and unrelated to Hardwick's claim of self-defense and instead attempts to portray his character in a favorable light, while casting law enforcement as negligent and their investigation inadequate. After review of the trial transcript and considering our caselaw applying *Doyle*, we conclude that Hardwick opened the door to admission of evidence of his post-*Miranda* silence for the limited

32

purpose of impeaching his testimony claiming a cooperative spirit to assist law enforcement in the investigation. Thus, we next consider whether the prosecutor stayed within the permissible, narrow bounds of impeachment consistent with *Doyle* and its progeny.

2. *Whether the prosecutor limited the permissible line of questioning to impeachment of implied spirit of cooperation*

After ruling that Hardwick had opened the door to the State's inquiry about his decision to invoke his right to remain silent under *Miranda*, the district court cautioned the prosecutor not to exceed that limited scope and then recalled the jury. The prosecutor proceeded with this permitted line of questioning:

"Q:     . . . You have twice now spoken about your willingness to cooperate in this case, haven't you?

"A.     Yes.

"Q.     When you were arrested, at some point you were taken to the Reno County Correctional—or the Reno County Law Enforcement Center, correct?

"A.     I don't think I was arrested yet at that time.

"Q.     You were detained?

"A.     Yes.

"Q.     Okay. And they fed you a meal?

"A.     Yes.

"Q.     And then after that they came in to talk to you?

"A.     There was somebody in there the whole time kind of talking with me.

"Q.     But they came in to talk to you specifically about the case after that, didn't they?

"A.     Nobody came and mentioned anything. I just asked if I was under arrest.

"Q.     You were read your Miranda rights; you recall that?

"A.     Yes.

"Q.     And that's your right to remain silent?

"A.     Yes. I was advised that I don't need to do that, that it wasn't a good idea for me to do that at the time from the officers."

At this point, the prosecutor asked the court to instruct Hardwick to answer the questions without elaborating. From there, the prosecutor continued questioning Hardwick about receiving *Miranda* warnings, being appointed multiple attorneys, and the fact that he still did not speak to law enforcement under those circumstances:

"Q.     And at that time you invoked your Miranda rights and told them you would not speak to them?

"A.     Yes.

"Q.     And you indicated without a lawyer?

"A.     Yes.

"Q.     You subsequently received a lawyer?

"A.     Yes.

"Q.     On September 9th?

"A.     I'm not sure about the time.

"Q.     If the court records indicated you were given a lawyer on the 9th of September you wouldn't argue with that?

"A.     Yes.

"Q.     You would argue or you would not argue with it?

"A.     I would not argue with it.

"Q.     And you did not come forward after you got an attorney?

"A.     It took my attorney sometime to show up, but yes, you're correct.

"Q.     And you ended up with a different attorney, correct?

"A.     When was that?

"Q.     Well, the attorney you got first was not Mr. Loftis?

"A.     No.

"Q.     And at some point you got Mr. Loftis?

"A.     Yes.

"Q.     And you didn't come forward at that time either?

"A.     No, I did not."

Following these admissions, the prosecutor immediately returned to the original line of questioning about Hardwick's removal and disposal of the physical evidence from the compound, specifically the handguns he claimed Anstine and Bates had on their person when they died, as well as Anstine's truck and its contents. In that context, the prosecutor referenced Hardwick's pre-arrest and pre-*Miranda* silence several times, which prompted Hardwick to respond that he did not have an attorney at the time. Each time Hardwick gave this explanation, the prosecutor stopped engaging on that point and moved on to the next question.

On rebuttal, the State recalled Detective Franklin and the prosecutor asked whether law enforcement could have investigated Hardwick's claim of rape in the days after the alleged incident if he had reported it at that time. Detective Franklin testified to his belief that a sexual assault exam can be conducted within the first 96 hours (4 days) but after that, evidence is less likely to be found. The prosecutor then checked off the days leading up to Hardwick's arrest, asking Detective Franklin to confirm that Hardwick had not reported the alleged rape to law enforcement on each of those days.

The prosecutor further asked Detective Franklin if law enforcement would have investigated Hardwick's claim of rape at the time of his arrest and whether law enforcement had any reason to believe Hardwick had suffered recent injury. Detective Franklin testified that Hardwick did not appear injured and did not report any injuries to law enforcement. Detective Franklin also confirmed that before the arrest, he received a call from Hardwick's girlfriend, Sherry, who reported Hardwick told her he was sexually assaulted or raped by Anstine or Bates or both men. This line of questioning appears to have been aimed at demonstrating how Hardwick's pre-*Miranda* silence—and not a failure on the part of the law enforcement—contributed to the loss of potential evidence of the alleged rape that Hardwick made a central part of his defense.

On redirect rebuttal, defense counsel sought to cast the blame back on law enforcement for not independently discovering this evidence, asking Detective Franklin, "Did you ask Mr. Hardwick if he had been raped?" Detective Franklin responded, "I did not."

The prosecutor engaged in recross-examination of Detective Franklin and explored the implications of Hardwick exercising his *Miranda* rights—that law enforcement could not ask him any potentially incriminating questions. When the prosecutor finished, defense counsel conducted further redirect examination and explored whether law enforcement had done anything to facilitate Hardwick's access to counsel or to contact him after an attorney was provided. The prosecutor took one last turn on recross to reiterate the point that law enforcement officers are trained not to contact a defendant who is represented by counsel in order to avoid interfering with the constitutional rights to silence and to counsel. The prosecutor then asked Detective Franklin whether he had been in contact with the public defender's office once Hardwick was appointed an attorney from that office. Detective Franklin confirmed he had communicated with the public defender's office but that no one from the office had conveyed Hardwick wanted to speak with or cooperate with law enforcement.

As before, the record reflects that Hardwick, both by his testimony and through defense counsel's questioning, opened the door to inquiry about invoking his *Miranda* rights and subsequent post-*Miranda* silence by implying that law enforcement had not conducted a thorough investigation and suggesting he would have cooperated if only law enforcement had asked the right questions or contacted his attorney(s). Under these circumstances, the State was entitled to dispel these impressions that were blatantly inconsistent with Hardwick's post-*Miranda* silence. And the State's questioning was to

the point and did not go into more detail than necessary to impeach Hardwick based on this inconsistency. We therefore conclude the State complied with *Doyle* when it elicited evidence of Hardwick's post-*Miranda* silence.

Affirmed.

LUCKERT, J., not participating.